In re Randy A. MELTON, Debtor.

Randy A. MELTON, Plaintiff,

v.

NEW YORK STATE HIGHER EDUCATION SERVICES CORPORATION, M & T Bank, Defendants.

Bankruptcy No. 94–12151 K.
Adv. No. 94–1093 K.

United States Bankruptcy Court,
W.D. New York.

Sept. 29, 1995.

Edwin A. Ilardo, Hamburg, NY, for Plaintiff.

Barry S. Weinstein, NYSHESC, Office of Counsel, Albany, NY, for Defendants.

MICHAEL J. KAPLAN, Chief Judge.

This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I), and was tried to the Court on August 30, 1995. The only witness was the Debtor-plaintiff, Randy A. Melton. Having considered the pleadings, testimony, other evidence, arguments, and applicable provisions of law, the following constitutes the Court's findings of fact, conclusions of law, and decision.

Although the facts of this case are unusual, the analysis has broad application. The question is this: To what extent may a lifestyle that limits a debtor's income be asserted by him or her to establish that repayment of a student loan would constitute an "undue hardship" under 11 U.S.C. § 523(a)(8)? The answer is that a lifestyle that is purely the result of free choice may not be asserted to prove undue hardship in the future.

### FACTS

The Debtor and New York State Higher Education Services Corporation ("NYSH-ESC") have stipulated to the following facts:

1. That the above named debtor filed a petition for relief under 11 USC Chapter 7 on July 25, 1994.

2. That a general discharge order was entered by this Court on November 23, 1994 in the plaintiff's underlying bankrupt-

cy proceeding, filed pursuant to 11 USC Chapter 7.

3. That the debtor filed a Summons and Complaint in an Adversary Proceeding issued on May 8, 1995, naming the NEW YORK STATE HIGHER EDUCATION SERVICES CORPORATION (NYSHESC) as the defendant.

4. That this is a core proceeding over which this Court has jurisdiction pursuant to 28 USC § 175(b)(2)(I) [sic].

5. That the defendant, NEW YORK STATE HIGHER EDUCATION SERVICES CORPORATION, has appeared and answered, and submits to the jurisdiction of this Court.

6. That the plaintiff, RANDY A. MELTON, applied for and received six student loans to attend Bryant & Stratton Business Institute. The loans were as follows:
1) 9/25/89–6/20/90 for $2625.00 Guaranteed Student Loan
2) 9/25/89–6/20/89 for $2000.00 Supplemental Student Loan
3) 7/02/90–3/23/91 for $2625.00 Guaranteed Student Loan
4) 7/02/90–3/23/91 for $1375.00 Supplemental Student Loan
5) 4/2/91–12/15/91 for $2625.00 Guaranteed Student Loan
6) 4/2/91–12/15/91 for $4000.00 Supplemental Student Loan

7. That plaintiff, RANDY A. MELTON's, guaranteed student loans had been matured for less than seven years at the time the plaintiff's bankruptcy petition was filed on July 25, 1994, and as such were nondischargeable pursuant to 11 USC 523(a)(8)(A).

8. That the plaintiff made payments on his account to the lender M & T Bank. The NYSHESC has received no payments inasmuch as the account was purchased as an open Bankruptcy claim.

9. That the plaintiff, RANDY A. MELTON, requested and received a period of forebearance [sic] from the lender from 10/28/91 to 1/28/92 and received forebearance [sic] for the period 3/28/94 to 11/28/94.

10. That the plaintiff, RANDY A. MELTON's student loans were purchased by the defendant, NEW YORK STATE HIGHER EDUCATION SERVICES CORPORATION, pursuant to the guarantee on July 09, 1995.

11. That the current amount of the debt of the plaintiff, RANDY A. MELTON, to the defendant, NEW YORK STATE HIGHER EDUCATION CORPORATION, is $10,365.54 in principal, 0.00 in interest accrued through July 09, 1995, plus continuing interest on principal pursuant to the promissory notes signed by the plaintiff.

12. That the regular monthly payment by the plaintiff, RANDY A. MELTON, to the defendant, NEW YORK STATE HIGHER EDUCATION SERVICES CORPORATION, on his student loans is $129.

The Court adduced the following additional facts at trial. The Court finds:

13. The Debtor is a single, healthy, twenty-eight year old man with a high school equivalency diploma and a two year diploma in computer programming.

14. He held a responsible position in low level management at $6 per hour for four years.

15. The Debtor has a presentable appearance.

16. He has a two year old daughter who does not reside with him, and he pays $25 per month to the county that is providing assistance to that child.

17. No evidence was presented as to whether the Debtor is or ever was married.

18. He presently lives with a woman who has two children, in a house owned by his father. The woman is described as being the Debtor's "girlfriend."

19. The girlfriend receives $700 in cash per month and $350 in food stamps per month from public agencies that are supposedly aware of her living arrangements. (The Debtor states that he and his girlfriend are treated as a "combined" case for public assistance purposes.)

20. She contributes $300 per month and he contributes $200 per month in rent paid to his father. She pays the utilities.

They share other household expenses other than his 1986 car, which he needs for work.

21. He is a pizza delivery person whose take-home pay averages $100 to $120 per week, inclusive of tips, but net of the deductions being taken to pay the $25 per month to the county that provides assistance to his own child.

22. He is reimbursed $.13 per mile in cash each night for gas and wear on his vehicle used in delivering pizzas.

23. He has dental problems for which he has been paying $50 per month, but he will be eligible for Medicaid coverage on his dental work next month.

24. The Debtor had dropped out of junior high school and later obtained a graduate equivalency diploma. Although he completed the two year program in computer programming at Bryant and Stratton, that school taught him no "C" language programming, and the only programming jobs available to him locally since he graduated in 1991 are in "C" language and its spinoffs.

25. In several jobs since 1991, the Debtor has earned no higher than $6 per hour. He currently earns $4.25 per hour plus tips.

26. He continues to seek better employment, not only in computer programming but in sales.

27. He works only 30 hours per week.

## ARGUMENTS

■ Within the Second Circuit, the standards governing the dischargeability of student loans were set forth in the case of *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2nd Cir.1987). The Circuit therein set forth a three prong test by which a debtor seeking to discharge an education loan must show:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;

(2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id.* at 396.

NYSHESC does not strenuously argue that the Debtor has failed to meet the first or third prongs of this test. He is currently dependent in part on his girlfriend's public assistance (or their "combined" award) to meet his daily needs. Of itself, that would appear to satisfy the first prong. As to the "good faith" prong, it can be noted that he has repaid a few thousand dollars of the original loan indebtedness, and that he has availed himself of opportunities for forbearance in instances in which he could not make meaningful payments.

Rather, NYSHESC stresses that the Debtor has failed to satisfy the second prong— that there is no obstacle to the Debtor improving his earnings. He is currently working only thirty hours per week, and there is no obstacle to his working a fuller schedule. Furthermore, his past employment history indicates skills that can bring him higher than minimum wage earnings.[1]

The Debtor does not deny that he might significantly improve his income, if he is fortunate. Rather, he argues that such improvements will be offset by a decrease in public assistance, the loss of Medicaid, and an increase in his child support obligation. In effect, unless he can improve his take-home earnings from about $400–$500 per month to more than three times that, the offsetting reductions in what is currently approximately $1000 per month in assistance will result in no extra money with which to pay anything on the student loan, he argues.

## DISCUSSION

### The Effect of Public Assistance on the Brunner *Analysis*

■ The Court took the matter under submission to deliberate not upon the proffered

---

1. This Court has previously examined the fact that the Second Circuit decision in *Brunner* does not permit a debtor to complain of the fact that the education obtained with the student loans at issue has provided that Debtor with no usable job skills. *See Kraft v. New York State Higher Educ. Servs. Corp. (In re Kraft)*, 161 B.R. 82, 85–86 (Bankr.W.D.N.Y.1993).

economic analysis (for it appears that the analysis offered by the Debtor is an accurate one), but upon the troubling implications of that argument for purposes of the second prong of the *Brunner* test.

What is troubling is the notion that any idiosyncracies of public assistance programs or child support contribution requirements which might impede the ability of the Debtor to improve his net household income may also actually help him prove that his circumstances will not improve, thus assisting him in discharging what is normally a non-dischargeable debt. After due reflection, the Court is now satisfied that the idiosyncracies of assistance programs have no relevant impact on the *Brunner* analysis. This can be seen by a comparison of the following two hypothetical debtors:

Debtor One's family subsists on about $1500 of net income per month, of which about $1,050 comes from public assistance or Medicaid. Debtor Two is in exactly the same position in all regards except that she earns the entire $1500 per month at her job. If Debtor Two were to take a second job and bring home an extra few hundred dollars per month, she might well be found able to pay the $129 per month called for by the student loan repayment schedule. But if Debtor One were to do the same thing, and if public assistance to his family were to drop (or his child support obligation to rise) an equal amount as a consequence, he still could not pay the student loan without undue hardship, and his student loan perhaps should be discharged.

Although this analysis would suggest a double standard, it would not be an unfair double standard. It would not result from the fact that there might be disincentives to self-improvement in the welfare system. Rather, since the subsistence needs of the two debtors are the same, the material difference would be that Debtor Two's actual earning power is much higher than that of Debtor One.

Once a debtor's earnings meet his or her subsistence needs, then each additional dollar of earnings (or at least a portion thereof) may be devoted to payment of student loans. But until that point is reached, added earn-ings go to meeting subsistence needs. Public assistance alleviates suffering in the meantime.

Thus, the double standard is between those whose earnings meet their needs and those whose earnings do not meet those same needs. This is not an unfair standard, and in fact has analogies at every level above subsistence level. For example, it is harder for a debtor who can earn $30 per hour to satisfy prong two of the *Brunner* test than it is for an identical debtor who can earn only $15 per hour, if the student loan payments are the same for both. This is because the lower earning debtor must work twice as many hours as the higher-earning debtor to obtain the same amount of additional income that can be devoted to student loan payments.

### Choice v. Obligation

The present Debtor has set forth his economic circumstances as if his household were a traditional family, but in fact he is not legally obligated to provide for his girlfriend and her children. If his choice to combine his financial affairs with his girlfriend's has the effect of reducing or limiting his present or future income, creditors like NYSHESC should not have to subsidize that choice. (This is not limited to any particular choice. If a student loan obligor with a medical degree decided to devote all of her time to volunteering at a soup kitchen rather than practicing medicine, the lender should not have to subsidize that choice. Because she would not be legally obligated to continue her volunteer work, and could become a practicing physician at any time, she would be unable to satisfy prong two of the *Brunner* test by using her present economic circumstances as her only evidence of her future earnings.)

It may well be that if the present Debtor's public assistance were not combined with his girlfriend's, he could still satisfy prong two of the *Brunner* test. Perhaps he could show that he derives greater economic advantages from her contributions to his living expenses than he could derive from disassociating his finances from hers and then obtaining full

employment. To make that showing might require him to proffer a budget that is free of her contributions but also free of the expense implications of her needs and those of her children. For example, he is fortunate that his father owns the house that he and his girlfriend rent. By what reasoning should the Court presume that if his girlfriend were not contributing to the rent, he would be unable to get roommates to do so under the usual terms on which increases in his own earnings would not decrease his roommates' ability to contribute?

Even if he were to have such roommates, it is possible that he could not realistically be expected to increase his earnings over the course of the next few years by an amount sufficient to repay these loans without undue hardship. But rather than attempting to make that showing, he asks the Court to treat him and his girlfriend and her children as a single economic unit. There is no authority in law to treat her or her children as the Debtor's dependents for purposes of § 523(a)(8)(B)[2].

This Court would not hesitate to discharge the debt upon a suitable showing. But no showing has been made at all as to what would happen if, for example, the girlfriend were to go elsewhere.

This is not to say that a debtor in this Debtor's situation could only prevail in this kind of case by speculating what his economic circumstances might be if he chose a different lifestyle. Nor is this to say that a debtor should change his or her lifestyle in order to prove the second prong of the *Brunner* test. Rather, when a debtor's actual income or expenses are not reliable indicators of his future economic position because they are not rooted in the sort of obligations that suggest constancy—some sort of "glue"—then (but *only* then) this Court is willing to consider such objective, extrinsic evidence as federal poverty guidelines. This Debtor should not be punished for his lifestyle choices by saddling him with a burden of proof that is impossible to satisfy. The

realistic earning power of this Debtor on a per-hour basis for the next several years was established at trial as being in the range of $6 to $10 per hour. But the only explanation of why he is not working more than thirty hours per week is that "there is no use in doing so." Such a debtor is not precluded from proving (if it is true) that even if he were to work fifty hours a week at $10 per hour, he would not meet recognized subsistence levels for a healthy twenty-eight year old man living alone and supporting one child.

It must be emphasized that reference to such objective, extrinsic standards in order to prove (rather than merely to support) a debtor's § 523(a)(8) case is appropriate only when the debtor's future economic circumstances are too speculative because they are a product of choice rather than obligation. So, for example, a debtor who owns her own home free and clear of encumbrances may not use objective housing cost data as a substitute for her actual expenses. For her to elect to incur housing expenses above the level that she in fact enjoys would be a choice not rooted in cognizable obligations.

The issue here is not one of morality, decency, or even "family values" (which are sometimes more evident in households not bound by marriage and adoption than in households that are). Rather, what is at issue is the simple distinction between choice and legal obligation. The result would be no different if a doctor chose to serve the poor for free. For this Debtor to rest his showing of undue hardship on a lack of potential for self-improvement created by his decision to link his financial affairs with his girlfriend's, has no authority in law. Nor is it persuasive. Although there is no categorical barrier to such a debtor demonstrating undue hardship, the Plaintiff here has not carried his burden of proof.

Were this Court permitted to legislate, it might provide that when student loan obligors make certain choices that will keep them poor, then their student loans may be

---

**2.** To be sure, the fact that a woman's live-in boyfriend who is not the father of her children is not legally responsible for the care of her children was the Supreme Court's rationale for striking down legislation that would have denied AFDC benefits to her children. *King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968).

discharged in bankruptcy under § 523(a)(8), which provides:

A discharge under section 727 . . . of this title does not discharge an individual from any debt.

> . . . . (8) for an educational benefit over-payment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or non-profit institution, or for an obligation to repay funds received as an educational benefit, scholarship, or stipend, unless—
>
> . . . . (B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

Taking a job in the "arts and letters," committing time to helping the destitute or unpopular, deciding to have a child or care for an elder, working for a religious mission and countless other choices, may of their nature make one poor or keep one poor. Lifestyle decisions such as these are often noble, but they are merely choices, not obligations, in the eyes of the law, however compelling or satisfying.

But the Court does not legislate; Congress does. Congress could have decided to favor such choices by discharge of student loan debt, as it has sometimes done in instances of health care professionals entering certain public service positions, teachers, and others.

■ This Court is instructed, furthermore, that it may not consider a debtor's choice of an unmarketable curriculum in deciding whether to discharge the loan, for it is only in placing that risk on the shoulders of the student that lenders may sensibly ignore the choice and assist in, for example, pursuit of an unmarketable degree. *See supra* note 1.

If this were not true, students might find it impossible to get student loans to study art history or philosophy.

Here the Debtor borrowed about $15,000 to get a worthless education in computer programming (though he could not have known it was worthless), and now has compounded that choice with a choice of lifestyle that virtually assures his poverty. (To be sure, even very hard work by this Debtor will not necessarily turn into a rosy future for him.) His motives are not in evidence. If we wish to, we could assume them to be altruistic, even noble, for purposes of today's decision.[3]

■ The Debtor asks the Court to declare that repayment of $10,365.54 of student loans (roughly $129 per month for ten years) (plus interest still accruing) would constitute an undue hardship.[4]

■ The Court holds that whether a debtor chooses privation for good reasons or for bad, § 523(a)(8) does not permit his choice to be exalted at the expense of an educational loan lender or guarantor. A debtor may not create undue hardship by a free decision to be less than optimally employed, however noble the motive.[5]

Although the Debtor at bar might conceivably have been able to prove that he would not be able to improve his financial condition under any circumstances, he has not carried his burden of doing so.

### CONCLUSION

The Debtor's Complaint must be dismissed for want of proof of undue hardship. If NYSHESC desires money judgment, it

---

3. The Court is not impressed, however, by this Debtor's reasons for refraining from seeking to earn more money as discussed herein. Those reasons are not noble.

4. It should be noted that a declaration of non-dischargeability does not command a debtor to make the payments; it merely leaves the lender to its collection remedies under non-bankruptcy law. This might mean nothing more than garnishment of 10% of a debtor's earned income for a period of years.

5. Bankruptcy provides relief from past mistakes or misfortunes by discharging the legal obligations that arose from them, with certain exceptions. But it will not force student loan insurers to subsidize *future* choices that are not rooted in obligation of some cognizable sort. Otherwise, every inability to repay that results from choice would fit within the phrase "undue hardship."

should provide an affidavit of amount due within ten days.

SO ORDERED.