In re Judith A. DOHERTY f/k/a Judith A. Gura, Debtor.

Judith A. DOHERTY f/k/a Judith A. Gura, Plaintiff,

v.

UNITED STUDENT AID FUNDS, INC., Defendant.

Bankruptcy No. 95–13797 K.
Adversary No. 97–1209 K.

United States Bankruptcy Court, W.D. New York.

March 27, 1998.

John J. Lavin, Lavin & Kleiman, P.C., Buffalo, NY, for Debtor/Plaintiff.

Raymond C. Stilwell, Adair Law Firm, Rochester, NY, for Defendant.

## MEMORANDUM OF DECISION

MICHAEL J. KAPLAN, Chief Judge.

After trial in this case, the Court ruled that this Debtor's student loan obligations to the Defendant, United Student Aid Funds, Inc. ("USA Funds"), would be discharged as constituting an "undue hardship" under 11 U.S.C. § 523(a)(8)(B).[1] The Court also announced that the reasons for that ruling would be set down in writing for the use of counsel in future cases, or in the event of appeal.

The Second Circuit in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2d Cir.1987), adopted a three prong test by which undue hardship under § 523(a)(8)(B) should be examined. That standard is:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her

---

1. Under § 523(a)(8)(B), a student loan debt may be discharged if "excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8)(B).

dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id.* at 396.

■ This writer finds that a cognizable category of debtors deserving of inquiry under § 523(a)(8)(B) consists of those debtors who provide undisputed evidence that they suffer from a presently incurable impairment of emotional or mental functioning that is:

(1) recognized by the mainstream of medical professionals to be bioneurological, physiological, or of other pathological or organic origin (as opposed to a matter of volition); and

(2) proven to be the cause of a particular debtor's present inability to maintain a " 'minimal' standard of living for herself and her dependents if forced to repay the loans," regardless of whether

(a) the disease is being properly treated, but nonetheless causes such inability, or

(b) the debtor's failure to receive proper treatment is either part of the disease or is otherwise excusable.

It is further found that a debtor who falls within the above category may, without more, satisfy the second prong of the Second Circuit's test in the *Brunner* case, but only in the absence of evidence militating against discharge of the debt.

■ It is also found that although the burden is on a debtor to prove all three prongs of the *Brunner* test, a debtor who presents undisputed medical evidence [2] of an emotional or mental disfunction as described above, has carried the burden as to the first two prongs. This is because a present inability to maintain a "minimal" standard of living (the first prong) is an element of the above-described category, and the evidence of a medical condition will meet the second prong

in the absence of other reasons not to discharge the debt.[3] Good faith (the third prong) must be met separately, though the impairment may be considered with respect to past efforts to repay as well.

## FINDINGS OF FACT

1. The Debtor, Judith Doherty, graduated from Erie Community College, South ("ECC") in 1986 with an associates degree in recreational leadership.

2. Within a year of graduating from ECC, she sought a degree in special education from Buffalo State College.

3. At the time, the Debtor was a single mother of two young children and she worked full time at Hopevale, Inc. ("Hopevale"), a residential treatment center for emotionally disturbed teen aged girls. The Debtor did not continue at Buffalo State because she found that with these work and family responsibilities, she could not also attend the requisite Buffalo State classes.

4. The student loans that are sought to be discharged total $18,595.51 plus interest, and were incurred during her time at ECC and Buffalo State.

5. The Debtor withdrew from Buffalo State and enrolled at Empire State College, which employs home study methods. She graduated in 1989 with a bachelor of science degree in human services.

6. Before enrolling at Empire State, she had made some payments on her student loans, but then received a deferment when she went back to school.

7. The Debtor maintained her employment at Hopevale from sometime in 1980 or 1981 until March of 1992, when she left her job at Hopevale because she was experiencing a difficult pregnancy. (She had remarried in 1989.) The physical exertion required by her job was too much because at times the girls she supervised needed to be physically restrained.

**2.** Evidence of diagnosis by an accredited M.D. specializing in such a disorder would suffice.

**3.** This formulation assures that high income or high asset debtors who suffer an impairment, or

debtors with other unusual circumstances, will not derive unfair advantage from this holding. See the discussion at the end of this Memorandum of Decision.

8. Despite leaving Hopevale, the Debtor suffered a miscarriage. She did not return to Hopevale because she was mentally and physically exhausted from her miscarriage and she was "burned out" from having worked with emotionally disturbed children for twelve years. She instead took a job at Metropolitan Life Insurance Co. She does not remember exactly what she earned there, but says that she worked on draw and commission. From the sketchy testimony it appears to the Court that it did not considerably exceed $15,000.[4]

9. During this period of employment, the Debtor did make some payments on her student loans, but does not remember the amounts or the dates.

10. After working at Metropolitan Life, the Debtor was employed by Buffalo Financial Associates as an investment broker. She worked there for less than one year, and remembers earning about $17,000 or $18,000 on a draw and commission basis. She left Buffalo Financial in August of 1994, for reasons not made clear.[5]

11. When she left Buffalo Financial, the Debtor went to work as a recreational therapist for People, Inc. (a company related to Hopevale).

12. Sometime during this period (and in close proximity) the Debtor underwent a hysterectomy; her son, by her first marriage, attempted suicide; and her second marriage approached failure. (It eventually did fail.)

13. The Debtor had been prescribed the antidepressant drug Zoloft for two years for depression. In September 1994, the Debtor attempted suicide by taking all of the Zoloft pills she had. She was hospitalized for three weeks and was diagnosed as suffering from bipolar disorder, which is more commonly known as manic depression. (The Court takes judicial notice that antidepressant drugs often have an effect on manic depressives that exacerbates the condition they are intended to alleviate.)

14. Following her suicide attempt, the Debtor was on disability leave from her job at People, Inc. She returned to work at People, but was not able to concentrate sufficiently and, by her testimony, her boss became increasingly unhappy with her work.

15. The Debtor was transferred to, and currently works at, Respite House (an organization related to People), where she takes care of children who are developmentally disabled. The children live at home with their parents, but Respite House is available for parents to leave their children when they need a break.

16. The Debtor currently earns $7.76 per hour, and has a net monthly total income of $920. Her son is in the military and her daughter supports herself by working, and also goes to college. According to a budget analysis prepared by Consumer Credit Counseling Service of Buffalo, Inc., she has modest projections for monthly living expenses which total $1,009.62.[6]

17. Her monthly budget is as follows:

| $400.00 | rent (including heat, electricity and telephone) |
|---|---|
| 140.00 | food |
| 42.12 | auto insurance |
| 31.00 | medical expenses |
| 30.00 | prescriptions |
| 231.50 | transportation (gas and repairs for 1979 Econoline van) |
| 25.00 | clothing |
| 5.00 | entertainment |
| 40.00 | tobacco |
| 30.00 | personal care |
| 35.00 | laundry |

4. During her testimony the Debtor occasionally became emotional and unable to pinpoint specific dates, dollars, and some details. She was, however, cooperative and credible.

5. See the footnote above.

6. This figure includes only living expenses and still exceeds monthly income by $89.62. The credit counselor's budget analysis includes additional monthly expenditures of $155 per month for repayment of attorney fees ($35/month for a total of $831.70) and other debts ($80/month for a total of $1,660.91). In questioning the Debtor's disposable income projections, USA Funds pointed out that the "other debts" which were being repaid should have been discharged in the Debtor's bankruptcy. Because the Debtor's living expenses exceed her income regardless of these additional expenditures their inclusion is of no consequence. Indeed, the $1,660.91 in question is inconsequential as regards the over $20,000 in student loan debts at issue here.

There is nothing available for gifts or to assist her children in any financial way.

18. The Debtor's scheduled monthly student loan payment would be $167.61, but might be calculated higher in light of interest arrears and collection charges.

19. She has no assets other than a 1979 Ford Econoline van that is "on its last legs."

20. In all, the Debtor has been hospitalized due to her bipolar disorder three times, all related to suicidal thoughts or suicide attempts. While in the hospital she engaged in "self mutilation," in the form of biting and scratching herself.

21. The Debtor has a family history of unipolar or bipolar illness; her father, brother and son all suffer or have suffered from depression.

22. The Debtor is currently on lithium and takes one 300 mg tablet four times a day. By her own testimony (and the Court does take judicial notice) there is no "cure" for bipolar disorder and she will have to continue taking lithium to regulate her mental functioning for the rest of her life.

## DISCUSSION

Except for the matters that are the subject of judicial notice,[7] the above facts are found entirely on the Debtor's own testimony; there was no medical testimony.[8] In this Court's experience, however, it is extraordinary for dischargeability litigation that hinges on a debtor's medical condition to actually hinge on medical testimony. This is because all dischargeability litigation involves real persons who are *debtors* under the Bankruptcy Code, and cannot afford to hire medical experts to testify to the effect of their disease on their earning capacity. When medical testimony is offered by the debtor it is to lay skepticism to rest, and in this writer's experience the medical condition of any debtor has never been the subject of dueling experts in § 523(a)(8) litigation.

So too is it common that a student loan lender has neither the financial means (spread across so many cases) nor the professional impulse to challenge a medical diagnosis or the effects thereof. Essentially, there is never an objection to the Court's taking judicial notice of the limitations imposed by a disabling impairment, even if a debtor's disease is of the brain rather than of muscle or bone. From the creditor's side, dischargeability litigation is not something that one wants to put a great deal of money into, in light of the uncertainty of ever being able to collect, unless the debtor is very young, or has a high earning capacity or has a prospect of future wealth by inheritance or otherwise.

Thus, a great deal is left to judicial notice in dischargeability litigation. No one brings in economists or other experts to testify as to trends in the local job market, or to address the debtor's earning prospects. Nor are other experts employed to testify as to: the cost of living locally; how long cars last here; local geography and climate and its transportation problems; the effects of divorce or separation; the implications of a debtor having very young children or children who suffer some infirmity; the employment implications of the fact that the debtor had some sort of brush with the law; and the value of certain types of skill or training.

---

7. This writer might be more familiar than others with facts "not subject to reasonable dispute" in these regards. *See* Fed.R.Evid. 201. This is because of his self-education in regards to an immediate family member who suffers an impairment that is not bipolar disorder, but that is also bioneurological in origin—obsessive-compulsive disorder.

8. The Debtor's prescription bottle of lithium was, however, admitted into evidence, and then returned to her.

In the present case, the question is what "adjudicative facts" are "not subject to reasonable dispute" when it comes to a certain category of incurable mental disease. The fortunate among us can palpably comprehend only impairments of muscle or bone. That fact results in more trials over the effects of a mental impairment than are conducted as to visible physical impairments. To lend predictability that might avoid such a need for trial, I offer the following reasoning.

This writer takes judicial notice that according to the National Institute of Mental Health's DEPRESSION/Awareness, Recognition and Treatment (D/ART) campaign:

> Bipolar disorder, also known as manic-depressive illness, is a *treatable illness* involving episodes of serious mania and depression: mood swings from overly "high" and irritable to sad and hopeless, and then back again, with periods of normal mood in between. The mood extremes may be of varying severity; the mood changes may occur gradually or rapidly.

> A lifetime illness that typically begins in adolescence or early adulthood, bipolar disorder is often not recognized as an illness, causing needless suffering for years or even decades.

> Effective treatment for this illness can alleviate suffering and usually prevent its devastating complications, which can include marital breakups, financial and occupational difficulties or losses, alcohol and drug abuse, and suicide.[9]

Bipolar disorder is believed to be of genetic origin,[10] but whatever the cause, the illness is related to the sufferer's neurochemistry. It is not self-induced.[11] Rather, "we know that ... bipolar disorders are associated with chemical changes in the brain and are therefore just as organic as any other disease."[12] Other disorders known to have bioneurological association are obsessive-compulsive disorder[13] and Tourette syndrome.[14] Some researchers believe that schizophrenia might also be so associated.[15]

■ In this case, the Debtor suffers bipolar illness. The good faith prong (the third prong) of the *Brunner* test is not seriously contested, and counsel for the Defendant raises only symbolic protest with respect thereto. That protest is rejected in light of the facts as set forth above. The Debtor has done what she could over the eight years after she finished school and before she filed this adversary proceeding. She filed Chapter 7 in October, 1995, but did not immediately seek to discharge her student loans. Rather, she tried for over a year and a half before reopening her case to commence this dischargeability proceeding. I find "good faith."

■ The Defendant's challenge based on the first prong is a bit more substantial in light of the relatively small loan payment involved ($168 per month), but will not be sustained here where the Debtor suffers the impairment, earns only $7.56 per hour at optimum employment that she has held over a long period of time, lives modestly, has no assets, and abides by a meager budget.

■ The genuine focus of this case is the second prong of *Brunner*. That is, "that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of

---

9. Excerpt on *Bipolar Disorder*, adapted from a publication written by Mary Lynn Hendrix of the Office of Scientific Information, National Institute of Mental Health (available on the Internet).

10. *Id.* And see also Francis M. Mondimore, M.D., *Depression (The Mood Disease)*, at 152–56 (1990).

11. Mondimore, *supra* note 10, at 85, 90–103.

12. *Id.* at 163.

13. National Institute of Mental Health, publication on *Obsessive–Compulsive Disorder* (NIH Pub-

lication No. 94–3755) (1994) (available on the Internet).

14. National Institute of Neurological Disorders and Stroke, publication on *Tourette Syndrome* (October 28, 1997) (available on the Internet).

15. U.S. Dep't of Health and Human Services, Public Health Service publication on *Schizophrenia* (DHHS Publication No. (ADM) 86–1457) (1990).

the student loans." This standard has been interpreted by some courts as requiring a showing of a "certainty of hopelessness." This writer has suggested with all sincerity that persons with such a certainty might elect a different escape and never reach the doors of the court.[16] Any fact finder that must find the future to a "certainty" is charged with an impossible task. Despite the growing acceptance of the "certainty of hopelessness" standard,[17] I submit that the notion that *Brunner* commands such a showing is simply wrong. That is not what this process is all about. Congress' and the Second Circuit's concern was with *abuse* by student loan debtors, and the second prong— some longer term "additional circumstances"—was simply an attempt by the Second Circuit to lend objectivity to the "undue hardship" inquiry. The substance must not be extinguished in the method. An effort to discern abusers from non-abusers as regards the test would be grossly unjust if it did not recognize that an incurable limitation that causes a present inability to maintain a minimal standard of living is reasonably likely to cause a long term inability to repay.

This writer ardently hopes that every worthy debtor will succeed beyond present expectations and proofs, but he will not find it "likely" that any impaired debtor will so succeed when there is no evidence to suggest it. A fact finder finds not "facts," but only what the evidence suggests is, was, or will be, most probable. I take judicial notice that the most probable near-future for a debtor who suffers from a diagnosed and treated manic-depressive disorder is maintenance of the status quo. That is what is "likely." As announced in Court, judgment will now enter for the Debtor.

### EXTENSION TO OTHER SIMILAR DISEASES

The proposition set forth at the outset was not limited to bipolar illness. Rather, it encompassed any "presently incurable impairment of emotional or mental functioning that is recognized by the mainstream of medical professionals to be of bioneurological, physiological, or of other pathological or organic origin (as opposed to a matter of volition)."

The purpose of a broader rule is two-fold: (1) to avoid the need to insist that the debtor's doctor commit to one diagnosis as among the various known disorders of pathological, organic, or bioneurological origin (or consequence) that may have similar or overlapping symptoms, or that might co-exist as to the same patient; and (2) to make the rule as useful as possible to counsel on both sides.

The rule has been drafted in such a way as to contain several safeguards for lenders. It creates only a "cognizable category of debtors deserving of inquiry under § 523(a)(8)(B)," and limits that category to those debtors who "provide undisputed evidence" of the specified type of impairment. There is no "per se" rule. Thus, lenders are free to raise dispute as to the existence, nature, or consequences of the debtor's illness, and it will be decided. Further, the illness must be "recognized by the mainstream of medical professionals" to be one of the designated types. No "quack medicine" or "false science" will be brought to bear against the lender. The illness must be proven to be the cause of a present inability to maintain a minimal standard of living for the debtor and her dependents if forced to repay the loans. Bringing oneself within the category does not suffice if the inability to repay is attributable to something other than the disease, such as, for example, the debtor's free choice,[18] or (in the case of one who is a high income debtor despite the illness) high living. Finally, a debtor who is in the category may, without more, satisfy the second prong of *Brunner*, but only in the absence of evidence militating against dis-

**16.** *See Kraft v. New York State Higher Education Services Corp. (In re Kraft)*, 161 B.R. 82, 84 & n. 2 (Bankr.W.D.N.Y.1993).

**17.** *See, e.g., In re Roberson*, 999 F.2d 1132, 1136 (7th Cir.1993); *Borrero v. Connecticut Student Loan Foundation, et al.*, No. 3:97CV 1382(AHN), 1997 WL 695515, at *2 (D.Conn. Oct. 21, 1997);

*Briscoe v. Bank of New York (In re Briscoe)*, 16 B.R. 128, 131 (Bankr.S.D.N.Y.1981).

**18.** *See Melton v. New York State Higher Education Services Corp. (In re Melton)*, 187 B.R. 98 (Bankr.W.D.N.Y.1995).

672

charge of the debt. This is an omnibus safety valve.

In sum, the purpose of this dictum is not to immunize a certain class of impaired debtors from having to repay student loans, but only to place debtors with a disease of the brain on an equal footing with debtors who are more visibly impaired, in attempting to satisfy the second prong of *Brunner.*

Judgment for the Debtor.

SO ORDERED.