In re Kenneth J. SALINAS and Jane Ann Manning, Debtors.

Kenneth J. Salinas, Plaintiff,

v.

United Student Aid Funds, Inc., Defendant.

Bankruptcy No. 98–53293–7.
Adversary No. 98–5159–7.

United States Bankruptcy Court,
W.D. Wisconsin.

Sept. 15, 1999.

Terrence J. Byrne, Byrne, Goyke, Til-lisch & Higgins, S.C., Wausau, WI, for plaintiff.

Jeffrey O. Davis, Quarles & Brady LLP, Milwaukee, WI, for defendant.

## MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

THOMAS S. UTSCHIG, Bankruptcy Judge.

Few would argue that a good education is a precious, if not priceless, investment, well worth the time and expense necessary to obtain it. Aside from the intrinsic value of continued learning, on a purely monetary level today's college graduates earn a wage premium of more than 40% over those with only a high school diploma.[1] As with most investments, however, that college degree comes with a price tag—and in many cases, a big one. According to one study, if college tuition costs continue to rise over the course of the next twenty years as they have over the past twenty years, more than 6.7 million students will be "priced out" of college.[2] Given cutbacks in recent years in various types of financial aid, a significant number of students are simply unable to meet the rising costs of tuition without taking out student loans. For example, during 1997–98 alone, students took out $36 *billion* in such loans.[3]

As with any investment, many who pursue a college education are financially rewarded for their efforts. Every year there are students who graduate and are highly successful in their chosen career paths. Their stories fuel the ambitions of others who embark upon their own college careers and meet a far less pleasant—and

---

1. According to the Economic Policy Institute, male and female college graduates earn a wage premium of 44% and 51%, respectively, over wage earners with only a high school diploma. *See* Christopher Farrell, *Loans for College Don't Have to Crush Grads*, Bus. Wk., July 12, 1999, at 147.

2. According to the Council for Aid to Education, a subsidiary of the Rand Corp., this amounts to roughly half of the students expected to seek higher education. *See Economically Driven Decisions are Transforming Higher Education*, U.S. News & World Report, Sept. 1, 1997.

3. In truth, financial aid of all forms has grown; a "commitment to educational opportunity" has resulted in increases in financial aid from $557 million in 1963–64 to approximately $50 billion in 1995–96. *See* J. Fredericks Volkwein, Bruce P. Szelest, Alberto F. Cabrera, and Michelle R. Napierski–Prancl, *Factors Associated with Student Loan Default Among Different Racial and Ethnic Groups*, 69 J. Higher. Ed. 206 (1998). Nonetheless, loans are Congress's preferred method of doling out financial aid. They now make up 60% of all financial aid packages, up from 52% only ten years ago. *See* Farrell, *supra* note 1, at 147.

less financially rewarding—reality. This case features such a debtor. Mr. Salinas pursued his dream of a medical career, and even though he never made it out of the starting gate, he nonetheless found himself strapped with well in excess of $100,000.00 in student loans. The Court's task is to determine whether the debtor has demonstrated that repayment of at least some of these loans would constitute such an "undue hardship" upon him that they may be discharged under the provisions of 11 U.S.C. § 523(a)(8).

The facts are as follows. The debtor, Kenneth J. Salinas, is 41 years old. Recently divorced, he is now pursuing a full-time sales career after spending a number of years at home raising his son while his ex-wife finished optometry school and found employment.[4] According to the debtor's amended schedule I, he has been employed by Marathon Communications in Wausau since February of 1998. His annual income is approximately $31,000.00, which is calculated upon a base salary (or "draw") and commissions.[5] His total monthly income, including net take home pay and support payments from his former spouse, is $2,531.36. His amended schedule J lists monthly expenses of $3,513.00.[6]

The debtor attended the Illinois College of Optometry from 1989 to 1992, and his present financial woes stem from this period of time. He owes approximately $68,-694.49 in Health Education Assistance Loans (or "HEAL" loans) to the Department of Health and Human Services. He also owes approximately $84,650.00 in non-HEAL student loans to United Student Aid Funds, the defendant in this adversary proceeding. The debtor failed to complete his optometry studies, and while he attempted to rejoin the College in a probationary context, he was ultimately unsuccessful in these efforts.[7] Subsequently, he spent time at home with his son while his wife completed her education.

The debtor and his former spouse moved to Wausau when she obtained employment in the area. Since their divorce, he has managed to find a position in a field completely unrelated to his course of study at the Illinois College of Optometry. He has been unsuccessful in his repeated attempts to find any other employment. According to the testimony of Dennis Goodwin, a labor market analyst with the Department of Workforce Development, Mr. Salinas is qualified to be a sales representative and consultant, perhaps in some type of managerial role. The statistical information provided by Mr. Goodwin at trial indicated that the job prospects for the debtor in the sales field were generally commensurate with his present employment, with perhaps a slight improvement for additional experience possible in the

---

4. Jane Ann Manning, the debtor's ex-wife, successfully completed her degree program and is presently an optometrist in the Wausau area. According to the evidence, her 1996 income was approximately $62,000.00, her 1997 income was $79,000.00, and her 1998 income was just under $83,000.00. Ms. Manning has her own student loans to repay, and additionally pays 3.6% of her salary to Mr. Salinas for child support. There is no contention by the defendant that she is responsible for any portion of the debts in this matter or that she is obligated to make any other contributions to support the debtor.

5. According to the testimony at trial, the debtor's base salary is $31,400.00. He is entitled to receive commissions when his sales reach a certain level. The debtor testified that he has

yet to reach this level or receive any commissions. He is also apparently entitled to receive reimbursement for mileage and travel expenses.

6. The debtor's expenses will be discussed in detail shortly. A few critical entries are a $753.00 mortgage payment, a car payment of $359.00; $750.00 in scheduled payments on the debtor's nondischargeable HEAL obligations, and $200.00 for "recreation, clubs, and entertainment, newspapers, magazines, etc."

7. The debtor testified that he met with school officials and requested re-admission to the program after his grades fell below acceptable levels. The College rejected this request.

future.[8]

■ The debtor concedes that the HEAL loans are nondischargeable under the applicable provisions of 42 U.S.C. § 292f.[9] However, he contends that the non-HEAL loans owed to the defendant can be discharged as they constitute an "undue hardship" within the meaning of 11 U.S.C. § 523(a)(8). That section provides that a debtor may not discharge a loan for:

> an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit ... unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

Under this section, the debtor bears the burden to prove that the loans constitute an "undue hardship." *In re Holmes*, 205 B.R. 336, 339 (Bankr.M.D.Fla.1997). The defendant contends that the debtor has failed to meet this burden.

The dischargeability of student loans has long been a source of political and judicial tension. *See generally*, Jeffrey L. Zackerman, *Discharging Student Loans in Bankruptcy: The Need for a Uniform "Undue Hardship" Test*, 65 Univ.Cinn.L.Rev. 691 (Winter 1997); Robert F. Salvin, *Student Loans, Bankruptcy, and the Fresh Start Policy: Must Debtors Be Impoverished to Discharge Educational Loans?*, 71 Tul. L.Rev. 139 (Nov.1996). The first federally sponsored student loans were authorized by the National Defense Act of 1958, which allowed educational institutions to make direct loans of mostly federal money to students. *See* Pub.L. No. 85–864, 72 Stat. 1580. In 1965, Congress created the first guaranteed student loan programs, under which billions of dollars of privately funded loans have been guaranteed by the government. *See* Higher Education Act of 1965, Pub.L. No. 89–329, 79 Stat. 1219. Given the presence of the governmental guarantee, private lenders have routinely extended credit to students who might otherwise not have been considered an acceptable credit risk. *See* Salvin, 71 Tul.L.Rev. at 144–45.

Perhaps predictably, within a few years after these programs were enacted, overburdened students began filing bankruptcy. Under the provisions of the Bankruptcy Act of 1898, there was no exception from discharge for these types of debts, and so they were routinely discharged as a general unsecured claim. Anecdotal evidence suggested that in certain instances students were filing bankruptcy shortly before graduation, without even attempting to make repayment. Other stories suggested that so-called "professionals," such as doctors and lawyers, were seeking to discharge the very loans that made it possible for them to pursue potentially lucrative careers.[10] Ultimately, as one court noted,

> context of bankruptcy reform include (i) a student who received his degree in June of 1975 and filed bankruptcy in August of 1975 to discharge indebtedness of nearly $2,000.00, $1,500.00 of which was his student loan; (ii) a graduate of a state college who was employed by the state of Vermont and owed a total of approximately $6,000.00, of which $5,700.00 represented student loan debt; and (iii) a graduate employed by a university medical center discharged more than $12,000.00, of which $9,300.00 was in student loans. *See* Hearings on H.R.Rep. 95–595, 95th Cong. 159 (1977) (statement of Ronald J. Iverson, Executive Director, Vt. Student Assistance Corp.). While these amounts seem small by today's standards, when adjusted for inflation they are far more significant. In addition,

---

**8.** *See* plaintiff's exhibit no. 3. According to Mr. Goodwin, statistical data "seems to indicate that occupations in Mr. Salinas's area of interest and qualifications are not very numerous at this time." *Id.*

**9.** HEAL obligations are only dischargeable if the court concludes that the failure to discharge the loan would be "unconscionable." 42 U.S.C. § 292f(g). This standard is typically considered even "more difficult to sustain" than that for more traditional student loans, which can be discharged pursuant to the "undue hardship" standard of 11 U.S.C. § 523(a)(8). *In re Barrows*, 182 B.R. 640 (Bankr.D.N.H.1994).

**10.** Examples cited in the congressional record when Congress considered the issue in the

A few serious abuses of the bankruptcy laws by debtors with large amounts of educational loans, few other debts, and well-paying jobs, who have filed bankruptcy shortly after leaving school and before any loans became due, have generated the movement for an exception to discharge.

*Matter of Rappaport,* 16 B.R. 615, 616 (Bankr.D.N.J.1981).

The 1970s saw the formation of a Commission on the Bankruptcy Laws of the United States, whose purpose was to review the 1898 Act and suggest modifications to the law based upon modern commercial and consumer practices. Those recommendations culminated in a report submitted to Congress in 1973. The Commission recommended that student loans should be presumptively nondischargeable unless the debtor could show that he or she was unable to earn sufficient income to fund repayment attempts. The Commission's "model statute" submitted with the report would have prohibited discharge of student loans which came due within five years of the bankruptcy filing, absent a showing of "undue hardship." The Commission did not define undue hardship, but stated:

In order to determine whether nondischargeability of the debt will impose an "undue hardship" on the debtor, the rate and amount of his future resources should be estimated reasonably in terms of ability to obtain, retain, and continue

employment and the rate of pay that can be expected. Any unearned income or other wealth which the debtor can be expected to receive should also be taken into account. The total amount of income, its reliability, and the periodicity of its receipt should be adequate to maintain the debtor and his dependents, at a minimal standard of living within their management capability, as well as to pay the educational debt.

*See* Executive Director, Commission on the Bankruptcy Laws of the United States, Report of the Commission on the Bankruptcy Laws of the United States, H.R.Doc. No. 137, pt. II (1973), reprinted in Collier on Bankruptcy app.2 (Lawrence P. King ed., 15th ed.1996), at 140–41.

Three years after the Commission submitted its report, Congress enacted a substantively similar statute as part of the Education Amendments of 1976. *See* Pub.L. No. 94–482, § 439A, 90 Stat.2081, 2141. For the first time, student loans were nondischargeable absent a showing of undue hardship. When Congress enacted sweeping bankruptcy reform legislation by passing the bankruptcy code into law in 1978, this exception to discharge was retained.[11] The legislative history of the interaction between student loans and bankruptcy thus reflects a continuing congressional policy to make it more difficult to obtain a discharge of educational obligations than typical unsecured debts.[12]

school tuition was less and there was less reliance on loans to fund education.

**11.** Interestingly enough, Congress was divided on the subject. The House Judiciary Committee decided against restricting the discharge of student loans. The Committee relied on a General Accounting Office study which indicated that the overall number of student loan bankruptcies was actually rather low. The study also indicated that most of the cases involved situations where the debtors had significant non-student loan indebtedness, which was a clear indication of genuine financial need rather than systemic abuse. The House view, however, did not prevail; the Senate version retained the recently-enacted restrictions, and they re-

mained in the statute passed by the full Congress. *See generally,* Salvin, 71 Tul.L.Rev. at 148–49.

**12.** While the Court acknowledges this congressional policy, it questions the judicial interpretation of this philosophy. A desire to curb abuses by well-to-do debtors who are fully capable of repaying their student loans is a far cry from a legislative intent to deny a discharge to those who desperately need it. This Court believes that Congress intended to prevent such abuse, but is not so certain that Congress intended to "promot[e] higher education by means of student loans whose repayment may be delayed or modified but is seldom discharged." *Cf. In re Heckathorn,* 199 B.R. 188 (Bankr.N.D.Okla.1996). While

For example, the restrictions on discharge of student loans originally applied only in chapter 7 liquidation cases, but in 1990 Congress amended the code to make § 523(a)(8) applicable to chapter 13 cases as well. At the same time, Congress extended the nondischargeability period from five years to seven. In 1998, Congress removed the time limit, and at the present time the only way a student loan can be discharged is if the debtor makes a sufficient showing that repayment would constitute an "undue hardship."

■ The courts have long struggled to fashion an appropriate definition of "undue hardship." One commentator put it as follows:

> The [undue hardship] exception is difficult to apply because the drafters of the Bankruptcy Code did not define undue hardship. The drafters said that bankruptcy courts must decide undue hardship on a case-by-case basis, considering all of a debtor's circumstances.

*See* Kurt Wiese, *Discharging Student Loans in Bankruptcy: The Bankruptcy Court Tests of "Undue Hardship,"* 26 Ariz. L.Rev. 445, 447 (1984) (citing the Commission's Report, H.R.Doc. No. 137, 93d Cong., 1st Sess., pt. II, at 140). Because Congress did not specify an exact definition, the court's application of this section to a particular debtor requires "the exercise of some measure of discretion." *In re Skaggs,* 196 B.R. 865, 867 (Bankr. W.D.Okla.1996); *see also Holmes,* 205 B.R. at 339 (the words "undue hardship" are words of art whose definition is left to the discretionary judgment of the court).

■ However, this lack of a "unified approach" has caused a number of courts to seek to standardize the analysis by adopting a definitive test and a consistent set of determinative factors. *See In re Faish,* 72 F.3d 298, 302–03 (3d Cir.1995). As a result, a variety of tests have evolved to address the issue—with such short-hand references as "the *Johnson* mechanical test" or the "totality of the circumstances" test or the "ability to pay" test or the "additional circumstances" test. *See* Thad Collins, Note, *Forging Middle Ground: Revision of Student Loan Debts in Bankruptcy as an Impetus to Amend 11 U.S.C. § 523(a)(8),* 75 Iowa L.Rev. 733, 744–45 (1990). This Court need not recite the particulars of these competing approaches because the Seventh Circuit adopted the so-called *"Brunner* test" in *Matter of Roberson,* 999 F.2d 1132 (7th Cir.1993). This test was first promulgated by the Second Circuit in the case of *Brunner v. New York State Higher Educ. Services Corp.,* 831 F.2d 395 (2d Cir.1987), and provides that a student loan may not be discharged unless the debtor demonstrates:

1. That the debtor cannot maintain, based on current income and expenses, a "minimal standard of living for [himself] and [his] dependents if forced to repay the loans."

2. That additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans.

3. That the debtor has made good faith efforts to repay the loans. *Brunner,* 831 F.2d at 396; *Roberson,* 999 F.2d at 1135; *see also Faish,* 72 F.3d at 305–06 (adopting the *Brunner* test as being most reflective of congressional intent).[13]

there is little doubt that Congress sought to "rescue" the student loan program from perceived "financial doom," an equally significant goal was to prevent "abuse of the bankruptcy process by *undeserving debtors." In re Pelkowski,* 990 F.2d 737, 743 (3d Cir.1993) [emphasis added].

**13.** According to the Third Circuit, *Brunner* provides "the definitive, exclusive authority" that must be utilized to determine whether "undue hardship" exists. *Faish,* 72 F.3d at 306. The *Faish* court noted that the test did not require the debtor "live in abject poverty," but nonetheless "safeguards the financial integrity of the student loan program by not permitting debtors who have obtained the substantial benefits of an education ... to dismiss their obligation merely because repayment ... would require some major personal and financial sacrifices." *Id.* at 305–06.

According to *Roberson*, the first prong of the test "requires an examination of the debtor's current financial condition to see if payment of the loans would cause his standard of living to fall below that minimally necessary." 999 F.2d at 1135. The second prong "recognizes the potential continuing benefit of an education" and requires that the debtor "show his dire financial condition is likely to exist for a significant portion of the repayment period." *Id.* The final prong requires the debtor to demonstrate that he or she has made a good faith effort to repay the loans, as measured by "his or her efforts to obtain employment, maximize income, and minimize expenses." *Id.* at 1136.[14]

This Court questions not so much the articulated aspects of the *Roberson* analysis but rather many of the student loan decisions which litter the judicial landscape, especially when those decisions are examined with proper deference to the history of § 523(a)(8). Many decisions discuss "undue hardship" in the most stringent of terms, focusing not upon whether the debtor possesses an "adequate" income but rather whether the debtor is scraping by on a "minimal" standard of living. Yet both of these terms are referenced in the original Commission report and the legislative history, and the adequacy of the debtor's income must receive equal attention in the analysis. *See In re Correll*, 105 B.R. 302, 306 (Bankr.W.D.Pa.1989) (where a family earns a modest income and the family budget reflects no frivolous expenditures but is still "unbalanced," an undue hardship exists). It must be remembered that neither the Commission nor Congress were concerned with capturing *every* student loan recipient who filed bankruptcy, but only those who could actually repay their loans.[15]

A review of the many cases discussing "undue hardship" offers the following insights. The mere fact that repayment of the student loan may impose a hardship on the debtor is not enough to permit dischargeability. *Holmes*, 205 B.R. at 339. Likewise, the fact that repayment may cause some "major personal and financial sacrifices" is also not sufficient. *Faish*, 72 F.3d at 306. Current financial adversity, characteristic of all debtors in bankruptcy, is not determinative. *In re Wardlow*, 167 B.R. 148, 151–52 (Bankr. W.D.Mo.1993).[16] Instead, there must be

---

Other courts are not quite so certain. The Sixth Circuit has specifically declined to adopt any one test, instead looking to "many factors," including the amount of debt, the debtor's claimed expenses and current standard of living, and any evidence regarding the debtor's efforts to minimize those expenses. *In re Hornsby*, 144 F.3d 433, 437 (6th Cir. 1998).

**14.** The peril of this test is not that it fails to reflect congressional intent but that rigid adherence to any one approach can become a straight-jacket, precluding a fair analysis of the circumstances of the particular case. For example, while the legislative history implicitly recognizes that debtors should seek a discharge in good faith, there are many cases where a debtor *might* have made *only* minimal payments but still deserve a discharge. Debtors who become disabled, or who through no fault of their own are simply unable to make payments, should not be penalized because of their precarious financial condition.

**15.** This Court questions the wisdom of denying a discharge to a debtor where the debtor's *income is insufficient to pay current expenses*, and the future seems similarly bleak. As a practical matter, there is little, if any, societal benefit to be gained by such a course of action. The debtor remains unable to pay, and the student loan remains unpaid. Such a draconian result is at odds with not only the fundamental "fresh start" philosophy underlying the entire bankruptcy code, but the history of § 523(a)(8) as well.

**16.** Likewise, the Court must be cognizant of the fact that it is the rare college graduate who steps directly into a high-paying job. Indeed, the "full economic benefits of higher education may be reaped only after a further post-graduate period of accumulating experience and deepening maturity." *Heckathorn*, 199 B.R. at 193. However, the relevant inquiry under § 523(a)(8) is really not whether the debtor is in worse financial straits than most bankrupt debtors; rather, the court's burden is to determine simply whether the debtor has a stream of income sufficient to fund not only

**314**

"additional circumstances" which make it unreasonable to expect that the debtor and his or her dependents are likely "to effect an improvement in their present needful circumstances." *Holmes,* 205 B.R. at 339; *see also Brunner,* 831 F.2d at 396–97. A minimal standard of living requires "more than a showing of tight finances." *In re Stein,* 218 B.R. 281, 287 (Bankr.D.Conn. 1998). Further, the debtor's financial distress cannot be of his or her own creation. *In re Skaggs,* 196 B.R. 865, 866 (Bankr. W.D.Okla.1996).[17] Distilled to its essence, the court must examine the debtor's current income and expenses and determine a "flexible minimal standard of living" which is sensitive to the particular circumstances of each case through the application of common sense. *Stein,* 218 B.R. at 287.

 The *Brunner* test has been interpreted by some as requiring a showing of a "certainty of hopelessness." *Barrows,* 182 B.R. at 648. Other courts have suggested that debtors must be living at or near the poverty level to obtain a discharge. For example, in *Holmes,* the court stated that the debtor must show that her financial resources "will allow her to live only at a poverty level standard for the foreseeable future." 205 B.R. at 340; *see also In re Griffin,* 197 B.R. 144, 147 (Bankr. E.D.Okla.1996) (the court focused on the Department of Health and Human Services Poverty Guidelines and the fact that the debtors were "significantly" above the guidelines for a family of similar size). However, *Roberson* does not require debtors to live in poverty. *Faish,* 72 F.3d at 305; *see also In re Ammirati,* 187 B.R. 902, 906 (D.S.C.1995) (while reference to the poverty guidelines would provide an objective test, § 523(a)(8) does not call for such an analysis). Further, those who harbor such a certain sense that their fate is hopeless "might elect a different escape

and never reach the doors of the court." *In re Doherty,* 219 B.R. 665, 671 (Bankr. W.D.N.Y.1998).

 Candidly, the function of the court is not to serve as a medium with a crystal ball or a cup of tea leaves. To suggest that the court's role as finder of fact is to ascertain the "certainty" of the future is to set an impossible task before those with imperfect vision. As the *Doherty* court stated:

> [The Court] ardently hopes that every worthy debtor will succeed beyond present expectations and proofs, but . . . will not find it "likely" that any impaired debtor will so succeed when there is no evidence to suggest it. A fact finder finds not "facts," but only what the evidence is, was, or will be, most probable.

*Id.* at 671. The bankruptcy court must determine what amount is minimally necessary to ensure that the debtor's needs for care, including food, shelter, clothing, and medical treatment are met. *In re Rice,* 78 F.3d 1144, 1149 (6th Cir.1996). Once that determination is made, the question is whether the debtor has any additional funds with which to make payments toward his or her student loan obligations. If not, the question becomes whether that lack of financial ability is "likely" to continue into the future, not whether the inability is "certain" to do so. *Roberson,* 999 F.2d at 1135.

 The requirement that there be some "additional circumstances" which indicate that the debtor will be unable to make payments does not mean that only those debtors who are elderly or disabled can obtain a discharge. While the *Brunner* court noted that the debtor in that case "is not disabled, nor elderly, and she has . . . no dependents," *see* 831 F.2d at 396, these comments are mere illustrations

---

necessary expenses but also make student loan payments as well. *In re Ammirati,* 187 B.R. 902, 907 (D.S.C.1995) (student loan discharged where debtor had shown he had done "everything possible to minimize expenses and maximize income").

**17.** *But see In re Cheesman,* 25 F.3d 356, 360 (6th Cir.1994) (debtors who chose to work in "worthwhile, albeit low-paying professions" demonstrated an undue hardship).

and not the only form of "additional circumstances." *Barrows*, 182 B.R. at 649 (court is most concerned with future employability of the debtor); *Ammirati*, 187 B.R. at 906 (*Brunner* provides "examples" of such additional circumstances, including illness, a lack of usable job skills, and the existence of a large number of dependents). In considering the debtor's future financial prospects, the financial, physical, or mental hardship which may have precluded the debtor's current or past ability to address the debt must appear likely to continue indefinitely into the future. *Id.*

■ Thus, if health difficulties contribute to the debtor's sub-minimal standard of living, then the prospect for recovery and defrayal of medical expenses within the repayment period is important. If the debtor is unemployed (or underemployed), the court must assess the debtor's future prospects for employment. *Stein*, 218 B.R. at 288. In the context of that examination, the assessment should recognize the "very real and continuing" benefit of the education received by the debtor. *Id.* While the court's task is not to assess whether the debtor received a "benefit" from the education in question, the fact that the debtor will not be able to pursue a career in that field of endeavor is nonetheless a valid consideration when examining the debtor's future prospects.

■ Based upon the foregoing, the Court concludes that the debtor has met the *Roberson* test and that the student loans in question are dischargeable. First, the debtor cannot maintain a minimal standard of living if forced to repay these student loans. His expenses already exceed his income by approximately $1,000.00 per month. While it is possible that he could sell his house and live in an apartment, his mortgage payment of $753.00 per month is not significantly higher than what rent might be, and is certainly not excessive.[18] In *Ammirati*, the debtor owned a $220,000.00 home which could be sold and thereby reduce the debtor's expenses by almost $1,200.00 per month. The potential savings appeared likely to result in a net benefit to the debtor from which payments could actually be made. 187 B.R. at 907. That is not the case here, as even cutting $200.00 or $300.00 from the debtor's bills could not result in any payment on these loans. While on the surface it appears the debtor could trim a significant amount of money from the $200.00 per month he budgeted for "recreation, clubs, and entertainment, newspapers, magazines, etc.," the uncontroverted testimony was that the overwhelming bulk of this money, when actually spent, went for business-related items which were not reimbursed by the debtor's employer.[19] As a practical matter, he is not able to pay all of his debts, especially when one considers the significant amounts he must pay on his nondischargeable HEAL loans.

Therefore, the debtor has done all he could to minimize his expenses and maximize his income. Candidly, a review of his budget and his trial testimony reflects that the debtor has a frugal lifestyle and lives paycheck to paycheck. *See In re Windland*, 201 B.R. 178, 182 (Bankr.N.D.Ohio

---

18. While the defendant has suggested that the equity in the debtor's home could fund a partial repayment, the debtor's exhibit no. 11 indicates a likely net equity of only $7,921.00. The Court considers this a rather high estimate, as the calculation does not account for possible repairs and the like which might need to be performed in the event of a sale. Regardless, this amount would be offset to some extent by moving expenses, security deposits, and the like, which would reduce the possible loan payment to little more than a nominal amount.

19. The debtor testified that he had to buy a number of magazines and periodicals to stay informed about the rapidly changing communications marketplace, and also had to participate in a number of business-related events and activities so as to meet potential clients and expand his customer base. Rather than being frivolous enjoyment, these items are actually primarily spent in an attempt to maximize income, and to trim significantly from this category would appear to actually injure the debtor's ability to make more money.

1996). Given the presence of his other student loans, he is actually still going backwards and may not benefit significantly from his bankruptcy in any event. The debtor's budget reflects only those amounts "minimally necessary" for care, food, shelter, clothing, and medical treatment. *Rice,* 78 F.3d at 1149. The debtor has made every effort to find more lucrative employment, without success. He has attempted to "minimize expenses and maximize income." *Ammirati,* 187 B.R. at 907. Thus, he has satisfied the first prong of the *Roberson* analysis.

The testimony at trial was that the debtor's financial prospects, while not as bleak as some, nonetheless will not allow him to generate significantly more income than at present. This Court will not close its eyes to the reality of the situation and suggest that the debtor could somehow manufacture sufficient income to make even nominal payments on these loans. The Court's obligation is to ascertain the debtor's *likely* future prospects. *Doherty,* 219 B.R. at 671. There is no indication that any of his current expenses could be eliminated or defrayed for the foreseeable future. And while he undoubtedly received some intangible benefit from his education, he quite frankly "flunked out" of optometry school and did not receive a degree. There is little, if any, future financial reward associated with his education that will be realized with the passage of time. *See Roberson,* 999 F.2d at 1132 (recognizing the "potential continuing benefit" of an education). The second prong of *Roberson* is therefore also satisfied.

The Court now turns to the last prong, that of good faith. The extent of any payments by the debtor on these loans is not clear, but he did not attempt to discharge the loans until nearly six years after he stopped attending school. He also has not sought to discharge his HEAL obligations, despite the fact that those loans continue to crush him financially. Instead, he concedes their nondischargeability and has scheduled payments on those loans in his amended schedule J. All of this evidences the debtor's good faith. He is not a well-to-do professional seeking to purge himself of an annoying debt; he is a struggling single father who cannot make ends meet. Any inability to pay is not the result of his own irresponsibility but is a simple function of his economic condition. The Court concludes that he has acted in good faith.

The defendant has suggested that the Court could either defer the dischargeability determination to some future date or otherwise restructure the debt so that the debtor could make payments. In the past, this Court has stressed its feeling that § 523(a)(8) provides no authority for such judicial tampering. Statutes are to be construed in accordance with their "plain meaning," without resort to the legislative history or other extraneous sources. *See Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 112 S.Ct. 1146, 117 L.Ed.2d 391, 397–98 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."); *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 244, 109 S.Ct. 1026, 1032, 103 L.Ed.2d 290, 300 (1989) ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' "). Section 523(a)(8) provides no alternatives—either a debt is dischargeable as an undue hardship or it is not.

This Court is not alone in its belief that § 523(a)(8) offers only an "all-or-nothing" result. In *In re Skaggs,* 196 B.R. 865 (Bankr.W.D.Okla.1996), the court observed that while this result might be perceived by some as "rewarding ... irresponsible debtors who create their own hardship by borrowing excessively and unrealistically," this is an argument better made to Congress than the courts. *Id.* at 866–67. The plain language of § 523(a)(8) implies that only the entire debt can be

discharged for undue hardship and does not authorize a partial discharge. *In re Taylor*, 223 B.R. 747, 753 (9th Cir. BAP 1998).

Even those courts which have accepted the notion of partial discharges and deferments acknowledge that the statute does not provide for such remedies. *See Cheesman*, 25 F.3d at 360–61 (deferment was proper exercise of bankruptcy court's equitable power under 11 U.S.C. § 105). And while the Seventh Circuit did give tacit approval to a two-year deferment in *Roberson*, the court did not indicate under what authority the bankruptcy court could enter such an order, or the exact circumstances under which it would be appropriate to do so. *See Roberson*, 999 F.2d at 1138.

In any event, to the extent that such a remedy is available under the law, this Court concludes this is not an appropriate case. A close reading of *Roberson* reveals that the court did *not* authorize a deferment when the debt is found to be an "undue hardship." Rather, this type of treatment is only appropriate where the court is unable to determine whether the debtor's financial distress will continue indefinitely. As the court stated:

> [T]he bankruptcy court factually found that [the debtor's] financial straits were not likely to continue for an extended period of time. Unquestionably, the short-term outlook is dismal.... However, the bankruptcy court found that these impediments would not prohibit gainful employment in the future.

999 F.2d at 1137. The Seventh Circuit's conclusion that the bankruptcy court appropriately deferred the dischargeability determination for a period of time actually served to give the debtor another chance to prove dischargeability. *Id.* at 1138. The debtor in this case has met all three elements of the *Roberson* test. Therefore, there is no basis for either a deferment or a partial discharge.

Accordingly, the student loans owed to the defendant are dischargeable as constituting an "undue hardship" within the meaning of 11 U.S.C. § 523(a)(8).

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.