In re Jerome STEIN & Marilyn Stein, Debtors.

Jerome STEIN, Plaintiff,

v.

BANK OF NEW ENGLAND, N.A., The Education Resources Institute, Inc., and Nellie Mae, Inc., Defendants.

Bankruptcy No. 93–50361.
Adversary No. 94–5007.

United States Bankruptcy Court,
D. Connecticut.

April 7, 1998.

MEMORANDUM OF DECISION ON COMPLAINT TO DETERMINE DIS-CHARGEABILITY OF DEBT UN-DER SECTION 523(a)(8)

ALBERT S. DABROWSKI, Bankruptcy Judge.

## I. INTRODUCTION

This adversary proceeding presents a disturbing tale of an irresponsible former student who, after receiving the benefit of an educational loan obtained on his behalf by his father, left his father to founder financially while he reaped the rewards of an advanced degree. The father now finds himself in bankruptcy, and calls upon this Court to declare the subject student loan dischargeable in his bankruptcy case. To accord the father such relief, this Court must determine either (i) that the nondischargeability rule of Bankruptcy Code Section 523(a)(8) is not applicable to a non-student debtor who is the sole obligor on an educational loan, or (ii) that excepting the debt from discharge will impose an "undue hardship" within the meaning of Bankruptcy Code Section 523(a)(8)(B). This Court is unable to accord relief to the father because, as a matter of law, Section 523(a)(8) does not distinguish between student and non-student obligors, and, as a factual matter, repayment of the subject debt will not impose a hardship that is "undue".

## II. JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant matter by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. § 157(a)(b)(1). This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2).

Stephen R. Bellis, The Pellegrino Law Firm, New Haven, CT, for Plaintiff.

John I. Bolton, Weinstein, Weiner & Shapiro Bridgeport, CT, for Defendants.

## III. PROCEDURAL BACKGROUND

On February 1, 1993, Jerome Stein and Marilyn Stein commenced a bankruptcy case (hereafter the "Bankruptcy Case") through

the filing of a joint voluntary petition under Chapter 7 of the Bankruptcy Code. An Order of Discharge was entered on May 11, 1993, and the case was closed on June 9, 1993. On January 13, 1994, despite the closure of the Bankruptcy Case, Jerome Stein (hereafter the "Debtor") initiated the instant adversary proceeding through the filing of a Complaint to Determine the Dischargeability of Debt Under Section 523(a)(8)[1] (hereafter the "Complaint"). Subsequently, and upon the Debtor's Motion to Reopen Case, filed on February 3, 1994, the Bankruptcy Case was reopened to permit the prosecution of this adversary proceeding.

After due notice a trial on the Complaint was conducted, at which time the Court heard the testimony of the Debtor and received the arguments of counsel, as well as the parties' oral stipulation of evidence. Having now reviewed the entire record, the Court renders this Memorandum of Decision.

## IV. FACTUAL BACKGROUND

The relevant facts are largely stipulated and are not otherwise in significant dispute. The Debtor executed as sole maker, a promissory note dated January 9, 1988, made payable to the Bank of New England in the original principal amount of $30,852.28 (hereafter the "Note"). The Note, guaranteed by Defendant The Education Resources Institute, Inc. (TERI), was subsequently assigned to Defendant Nellie Mae, Inc. At the time of trial there was due and owing $28,510.00 in principal and accrued interest.

The purpose of the loan evidenced by the Note was to finance the Debtor's son's acquisition of a Masters Degree from the University of Chicago. The proceeds of the loan were paid directly to the University of Chicago in the form of tuition. While the Debtor's son did not execute the Note[2], he clearly benefited from the education funded by the loan proceeds. At the time of trial the son

had received his advanced degree and was employed as a marketing researcher for a large company.

The Debtor made monthly payments of $380.00 on the loan from February, 1988 to approximately February, 1992. In connection with the first six to eight payments under the Note the Debtor was assisted by contributions of approximately $100.00 per month from his son, who had then started his first job. However, following what the Debtor described as a "profound difference of opinion as to who was responsible [for the payments]" Tr. at 34, the son ceased all contributions.

At the time of trial, the Debtor was married, and approaching 66 years of age. He graduated from Brooklyn College in 1951 with a degree in English Literature and, in 1968, obtained a Masters Degree in Business Administration from St. John's University. He worked in the advertising industry for approximately 30 years, during which time, according to his testimony, he "didn't become wealthy, but came away with some money." Tr. at 27. In 1981, after being dismissed from an advertising job, the Debtor used savings he had accumulated to open a card and gift shop, which he ran for nearly seven years. The Debtor's business eventually foundered, and his home and business were seized by lending institutions. The Debtor and his wife were forced to move into the rental premises that they occupied at the time of trial, and for which they were obligated to pay approximately $1,027.00 monthly.

After losing the gift shop, the Debtor began his present employment as a registered representative in the securities industry, from which he earns approximately $18,000.00 annually.[3] This sum, combined with household Social Security income slightly in

---

1. Fed.R.Bankr.P. 4007(a) provides that "[a] debtor or any creditor may file a complaint to obtain a determination of the dischargeability of any debt." Rule 4007(b) provides, inter alia, "[a] complaint other than under § 523(c) [referencing §§ 523(a)(2), (4) and (6) ] may be filed at any time."

2. The Debtor testified that his son did not sign the note because he "had no job... [and] ... [t]he only way he could get that loan was for me to sign it." Tr. at 33.

3. A small portion of this $18,000.00 may be attributable to Mrs. Stein's occasional and part-time temporary work.

excess of $17,000.00 [4], yields an annual income of roughly $35,000.00.[5] From this income the Debtor is able to meet his annual expenses, not including payments on the Note, of approximately $33,000.00 to $34,000.00.[6]

The Debtor's wife, Marilyn Stein, suffers from numerous health-related problems, including cancer. The Debtor testified at length about the draining impact of his wife's illness on their financial resources, including the cost of prescription medication which she must take daily for the rest of her life, and for which they had no insurance coverage. At the time of trial the Debtor and his wife were covered by a managed health care program which offers partial coverage coupled with a deductible and a co-payment. However, Mrs. Stein is presently eligible for Medicare. Mrs. Stein's employment prospects are bleak due to a combination of circumstances, including her age and health condition.

The Debtor has less significant health problems, although he requires prescription medication. He too is eligible for Medicare. He testified that his prospects for better employment are "not optimistic", largely due to his age.

As noted *supra*, the Debtor's son is not presently defraying any of his parents' expenses. The Debtor's other child, a daughter, is a neuropsychologist who, although she has a family of her own, occasionally provides her parents with financial assistance of approximately $50.00 per month.

### V. DISCUSSION

Students on the verge of lucrative careers seeded by increasingly expensive educations, and the parents who fund those educations, proudly waken to the sound of their alarm clocks on graduation day. However, the happiness of that day is dampened by the sound of another clock—now ticking on obligations to repay burdensome educational loans. Most student loan recipients dutifully honor their financial commitment to timely repay the debt which enabled their education. Some graduates, however, ignore the clock, and abuse the availability of a bankruptcy discharge by filing a petition at a stage of life when their assets are few, and the stigma of bankruptcy relatively painless. To this increasing minority who, without extenuating circumstances, sought to shed in bankruptcy their graduation-ripened obligations to repay government-sponsored student loans, Congress responded with Section 523(a)(8). *See* H.R.Doc. No. 137, 93d Cong. 1st Sess., Pts. I & II (1973), *reprinted in* App. 2 *Collier on Bankruptcy*, § I, at 176–77.

Section 523(a)(8) provides, in relevant part, as follows:

(a) A discharge under section 727 ... of this title does not discharge *an individual* from *any debt* —

\* \* \* \* \* \*

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for any obligation to repay funds received as an educational benefit, scholarship or stipend, unless—

(A) such loan ... first became due more than 7 years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition; or

(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents. . . .

11 U.S.C. § 523(a)(8) (1993) (emphasis supplied).

Through this enactment Congress sought to reduce bankruptcy defaults, and thereby advance the original purposes of the student

---

**4.** The Debtor receives approximately $1,000.00 per month, and his wife receives approximately $424.00 a month, in Social Security benefits.

**5.** At the time the Note was executed, the Debtor and his spouse earned an annual income of about $50,000.00.

**6.** Included among these expenses are monthly payments of $316.15 on an automobile installment note. These payments were scheduled to cease in January, 1997.

loan programs; *i.e.* to assure that students attending college would have reasonable access to low interest rate loans. *See* S.Rep. No. 673, 89th Cong., 1st Sess. (1965). Congress' broad purpose was "to keep our student loan programs intact," *In re Karben,* 201 B.R. 681, 684 (Bankr.S.D.N.Y.1996) (*quoting* remarks of *Representative Ertel,* 124 Cong.Rec. 1791–92), thereby benefiting future students whose education would not be possible without a "continued recycling of funds." *Id.* at 684.

The Debtor concedes that his obligation under the Note "first became due" *less than* "7 years ... before the date of the filing of the petition" within the meaning of Section 523(a)(8)(A), and thus has not become dischargeable simply by the passage of time. Rather, he opines initially that he need not heed the student loan repayment clock because Section 523(a)(8) renders as nondischargeable only educational loan debts owed by those who actually receive the education funded by the subject loans. The sole articulated basis for his argument is a "reasonable reading of section 523(a)(8)." [7] Tr. at 73.

### A. Applicability of Section 523(a)(8) to Non–Student Obligors.

■ The traditional process of statutory construction requires a court to look first to the statutory language itself, and "then to the legislative history *if the statutory language is unclear,*" *Toibb v. Radloff,* 501 U.S. 157, 162, 111 S.Ct. 2197, 2200, 115 L.Ed.2d 145 (1991) (emphasis supplied). The introductory language of Section 523(a)(8), plainly read or reasonably interpreted, clearly suggests that educational loans are nondischargeable regardless of whether the borrower was the student. "Section 523(a)(8) does not refer to 'student debtor' but applies to limit discharge of any 'individual' debtor from 'any debt' for a covered educational loan." *In re Pelkowski,* 990 F.2d 737, 741 (3rd Cir.1993). The statutory language is unambiguous and draws no distinction whatsoever between student and non-student obligors. *See In re Palmer,* 153 B.R. 888, 894, fn. 14 (Bankr.D.S.D.1993) (summarizing and

tallying case law—11 decisions supporting an all inclusive approach to the application of Section 523(a)(8), and eight concluding Section 523(a)(8) is intended to apply to student debtors only). Nor does the statutory language distinguish between non-student *comakers* and non-student *sole makers. See Id.* at 739, 744; *In re Hudak,* 113 B.R. 923, 924 (Bankr.W.D.Pa.1990).

The United States Supreme Court has acknowledged that "in rare" cases the literal application of a statute may produce a result "demonstrably at odds with the intentions of its drafters." *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982). In such cases, the spirit behind the law, ordinarily discernable through unambiguous legislative history, rather than the strict language of the statute itself, should control. *See Id.* Assuming, *arguendo,* that recourse to considerations extrinsic to the statute are appropriate, the legislative history of Section 523(a)(8)(B) presents no conflict with the plain reading of the statutory language. It is clear that in enacting Section 523(a)(8) Congress was concerned not with the nature of the debtor but with the nature of the debt. The intended beneficiaries of this dischargeability exception were future student loan recipients, not present student loan obligors. The continued viability and affordability of student loan programs is served by the statute's application to non-student obligors. Thus the plain language of Section 523(a)(8) is harmonious with its legislative history.

Having determined that Section 523(a)(8) is applicable to a non-student obligor such as the Debtor, the Court now turns to consider the Debtor's alternative argument—that nondischargeability would impose upon him an "undue hardship" within the meaning of that Section.

### B. Analysis of Undue Hardship under Section 523(a)(8)(B).

#### 1. Burden of proof.

■ As a preliminary matter the Court notes that the burden of proof on the issue of

---

7. No written briefs were filed in this matter. During oral argument following the conclusion

of trial neither counsel cited legal authority for their positions.

*undue hardship* is on the Debtor. Neither Bankruptcy Code Section 523 nor the Federal Rules of Bankruptcy Procedure provide an allocation of the burden of proof in dischargeability proceedings. Most courts, however, guided by the construction of Section 523, its legislative history and the evolving body of court decisions on that subject, *see, e.g., In re Keenan,* 53 B.R. 913, 916 (Bankr.D.Conn.1985) (noting that a debtor/plaintiff in a Section 523(a)(8)(B) complaint asserts an affirmative defense); *In re Lindberg,* 170 B.R. 462, 464 (Bankr.D.Kan. 1994); *Mathews v. Higher Education Assistance Foundation and United Department of Education, et al.,* 166 B.R. 940, 943 (Bankr. D.Kan.1994); *In re Foreman,* 119 B.R. 584, 586 (Bankr.S.D.Ohio 1990), have determined that the burden of proof on this issue is on the debtor. In the present case the Debtor's counsel accepted that burden. Tr. at 57.

### 2. The *Brunner* standards.

In the Second Circuit the existence of *undue hardship* must be determined according to the three-part test announced in *Brunner v. New York State Higher Education Services Corp.,* 831 F.2d 395 (1987).[8] According to *Brunner,* in order to prove *undue hardship,* a debtor must show by a preponderance of the evidence that:

1) the debtor cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the loans;

2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period; and

3) the debtor has made good faith efforts to repay the loans. 831 F.2d at 396.

### a. Maintenance of minimal standard of living.

The first element of *Brunner* requires a showing that the debtor "cannot maintain, based on current income and expenses, a 'minimal' standard of living for [himself] and [his] dependents if forced to repay the loans." This minimal standard of living test "requires more than a showing of tight finances," *Pennsylvania Higher Education Assistance Agency v. Faish,* 72 F.3d 298, 306 (1995), and is not met "merely because repayment of the borrowed funds would require some major personal and financial sacrifices." *Id.* On the other hand, the test does not require the Debtor to demonstrate that repayment of the loan would cause him and his family to live at or below the poverty level. *See In re Correll,* 105 B.R. 302, 306 (Bankr.W.D.Pa.1989).

Distilled to its essence, this test requires the Court to examine the Debtor's current income and expenses and determine a flexible minimal standard of living level sensitive to the particular circumstances of each case through the application of common sense. In exercising discretion in this regard, courts have found household incomes much less than the Debtor's sufficient to maintain a minimal standard of living. *E.g. Halverson v. Pennsylvania Higher Education Assistance Agency et al.,* 189 B.R. 840, 844 (1995) (finding that "a combined total net income of approximately $21,000 per year for a family of three must be above a 'minimal' standard of living....").

### b. Circumstances indicating persistence of condition.

If the Court finds a sub-minimal standard of living, it must then assess the likely persistence of that state of affairs. This second prong of the *Brunner* test focuses on the clear Congressional intent behind Section 523(a)(8)—to make the discharge of student loans much more difficult than that of other non-excepted debt. *Brunner, supra,* 831 F.2d at 396. Requiring "additional circumstances ... indicating that this state of affairs [inability to pay and maintain a minimal standard of living] is likely to persist for a

---

8. This three-part test has been utilized by courts in other circuits as well. *E.g. In re Mayer,* 198 B.R. 116 (Bankr.E.D.Pa.1996); *Commonwealth of Virginia State Education Assistance Authority v. Dillon,* 189 B.R. 382 (W.D. Va. 1995); *In re Coveney,* 192 B.R. 140 (Bankr.W.D.Texas 1996); *In re Windland,* 201 B.R. 178 (Bankr.N.D.Ohio 1996); *In re Roberson,* 999 F.2d 1132 (7th Cir. 1993); *In re Hawkins,* 187 B.R. 294 (Bankr. N.D.Iowa 1995); *and In re Dennehy,* 201 B.R. 1008 (Bankr.N.D.Fla.1996).

significant portion of the repayment period more reliably guarantees that the hardship presented is 'undue.' " *Id.*

■ If health difficulties contribute to the sub-minimal standard of living, then the prospect for recovery, and/or defrayal of medical expenses within the repayment period becomes highly relevant. If the debtor is un- or under-employed, then the Court must assess the debtor's future prospects for employment. In the case of student debtors, that assessment legitimately recognizes the very real and *continuing* benefit of the education acquired through the loan. Therefore, courts properly consider whether debtors have obtained and are using the substantial, continuing benefits of an education funded by taxpayer dollars as they intended and anticipated when they took out the loan. *See Pennsylvania Higher Education Assistance Agency v. Faish, supra,* 72 F.3d at 298, 306.

### c. Good faith effort.

■ The third prong of the *Brunner* analysis—whether the debtor has made a *good faith* effort to repay his loan—recognizes that *undue hardship* "encompasses a notion that the debtor may not wilfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.' " *Matter of Roberson,* 999 F.2d 1132, 1136 (7th Cir.1993). Moreover, upon receiving the taxpayer-guaranteed loan and consequent educational benefit, a debtor assumes an obligation to make a *good faith* attempt at full repayment as "measured by his or her efforts to obtain employment, maximize income and minimize expenses," *Id.,* and to undertake all other

reasonable efforts to insure repayment. *See Brunner, supra,* 831 F.2d at 397.

### 3. Application of the *Brunner* test to the Debtor.

■ Against this background of legal authority the Court now turns to analyze the factual circumstances presented by the Debtor in this case. The determination of whether the Debtor can maintain, based on current income and expenses including medical expenses,[9] a "minimal standard of living" if forced to repay the loan begins, and arguably ends, with the fact that the Debtor has an annual income of approximately $35,000.00 [10] That income is more than three times the applicable poverty level for a family of two.[11] An annual income approaching $35,000.00 may not afford the Debtor a lavish lifestyle but, by his own testimony, Tr. at 37–38, it permits him to "break-even." Indeed, it is only the estimated $380.00 a month for the student loan repayment that is not presently provided for in the Debtor's own "balance sheet."

■ A full appreciation of the hardship which would result to the Debtor by a determination of nondischargeability of this educational debt requires reference to the Debtor's Statement of Financial Condition, submitted into evidence as Exhibit 2. This Statement, signed by the Debtor and his spouse, reads, in part, "[m]y two children help us out financially to the extent they can, but *we want to be self sufficient.* Having the burden of payments for the student loan would prevent this" (emphasis added). From the Debtor's own perspective the cardinal component of the hardship that will be imposed on him by the compelled repayment

---

**9.** As previously noted, the Debtor offered uncontested evidence that he, and more particularly his dependant spouse, suffer and will in all probability continue to suffer from health-related problems.

**10.** The Court arrived at the $35,000.00 annual income figure by adding the Debtor's estimate of annual income ($18,000.00), Tr. at 28, to an estimated $1,424.00 per month in combined Social Security income. Tr. at 35. The Debtor initially testified that his annual income was approximately $34,000.00 and he had an estimated $33,000.00 in annual expenses. Tr. At 37. He further testified that the evening before the hear-

ing he tried "to figure out exactly what [these figures] were," concluding that "it's a break-even situation ... based on a $33,324.00 annual expense situation." Tr. at 38, As previously mentioned, the Debtor's expense figures did not include an amount allocated for repayment of the student loan since no such payments were being made at the time of the hearing . .

**11.** *See* Poverty Guidelines of the Department of Health and Human Services, published March 4, 1996, establishing the poverty level for a family of two at $10,360.00.

of this educational debt will be his reluctant acceptance of offers of financial assistance from his well-educated children. One of these children, his son, reaped a Masters Degree in Marketing and obtained employment as a marketing researcher as the direct result of the educational loan the Debtor seeks to discharge. Preclusion of the Debtor's ability to elect to be free to decline financial assistance from the direct beneficiary (his son) of the educational loan proceeds is not a "hardship" under any standard. Draining even one dollar from the pool of funds Congress intended to make available to future students whose educations would not be possible without such funds to provide the Debtor this choice disfigures the letter and dishonors the spirit of Section 523(a)(8). And as a practical matter the Debtor's choice to be self-sufficient as to his son was effected in 1988 when, shortly after graduation, that son financially abandoned his parents. While the Debtor may choose to accept from his daughter limited financial assistance, reliance on her voluntary contributions is a from cry from a hardship which is "undue." Moreover, even without any financial assistance from either of his children the Debtor can maintain, based on present income and expenses, a minimal standard of living for himself and his spouse if forced to repay this loan. In light of the foregoing, this Court concludes that the Debtor has failed to satisfy the first element of the *Brunner* test.

 Even if the Debtor satisfied the minimal standard of living test, he would not qualify for a discharge without satisfying each of the remaining two *Brunner* prongs. The Debtor must establish under the second prong of the *Brunner* test that "additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period." *Brunner, supra,* 831 F.2d at 396. While just "breaking even" at the time of the trial, the Debtor's car payments of $316.15 per month should have ceased in or before January, 1997, providing a boost to the amount of disposable income equal to 83% of the estimated student loan payments. *See* Tr. at 62. In addition, within a shorter time frame, *see* Tr. at 42, the Debtor's spouse would turn sixty-five (65)

and become eligible for Medicare, eliminating at least some of the present medical expense. The sum of the terminated car payments and the increased Medicare benefits is the financial equivalent of the education loan repayments. Accordingly, by the Debtor's own financial calculations, even with forced educational loan repayments of $380.00 per month, he will "break even" over most, if not all, of the educational loan repayment period. Finally, and in addition, the Debtor's own extremely pessimistic outlook for future employment does not square with his extensive business experience and his Masters Degree in Business Administration. Accordingly, even were this Court to determine that the Debtor's "break-even" financial situation precluded him from maintaining a minimal standard of living if forced to repay the loan, there are no additional circumstances to indicate that this state of affairs will persist. The circumstances suggest the opposite— that his financial condition measured by disposable income will improve and his potential for future employment is positive.

The third prong of *Brunner,* requiring the Debtor to establish *good faith* efforts to repay the loan, was not placed in issue at the hearing and, when raised by the Court during oral argument, was conceded by Defendant's counsel. Tr. at 65.

### SUMMARY AND CONCLUSION

The Debtor can easily maintain, based on current income and expenses, a minimal standard of living for himself and his spouse if compelled to repay the educational debt he incurred to fund his son's Masters Degree. In addition, early in the repayment period the Debtor's disposable income will increase significantly, reflecting, along with his somewhat promising prospects for future employment, and notwithstanding his spouse's serious medical condition, a likelihood for an improved financial state of affairs during most of that period. Accordingly, having determined that the Section 523(a)(8)(B) exception to dischargeability is applicable to non-student debtors, and that excepting the Debtor's educational loan debt from discharge imposes no "undue hardship" on the Debtor or his spouse, this Court finds that

the entire amount of the Debtor's educational loan debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(8)(B). A separate Order shall issue this same date.

### JUDGMENT

This adversary proceeding having come on for trial before this Court; and the Court having received and reviewed the evidence, and having heard and considered arguments of the parties thereon; and the Court having this day issued its Memorandum of Decision on Complaint to Determine Dischargeability of Debt Under Section 523(a)(8), in accordance with which it is hereby

**ORDERED** that judgment shall enter in this adversary proceeding in favor of the Defendants Bank of New England, N.A., the Education Resources Institute, Inc., and Nellie Mae, Inc. The Debtor–Plaintiffs student loan debt, as described in his Complaint, is **nondischargeable** pursuant to Section 524(a)(8)(B).