In re George C. MALLINCKRODT,
Debtor.

George C. Mallinckrodt, Plaintiff,

v.

Chemical Bank, Nellie Mae, Sallie Mae, the Education Resources Institute, Inc., and USA Group Loan Services, Inc., Defendants.

Bankruptcy No. 00–10957–BKC–AJC.
Adversary No. 00–1220–BKC–AJC–A.

United States Bankruptcy Court,
S.D. Florida,
Miami Division.

April 4, 2001.

Mark D. Wallace, Stack Fernandez Anderson Harris & Wallace, P.A., Miami, FL, for Plaintiff.

John D. Eaton, Verner, Liipfert, Bernhard, McPherson and Hand, Miami, FL, for Defendant The Education Resources Institute, Inc.

Alejandro F. Hoyos, Holland & Knight, LLP, Miami, FL, for Defendant Educational Credit Management Corporation.

## MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

THOMAS S. UTSCHIG, Bankruptcy Judge.

The debtor brought this adversary proceeding to determine whether his student loan obligations to the various defendants are dischargeable under the terms of 11 U.S.C. § 523(a)(8). This section of the bankruptcy code provides for the discharge of student loan debts to the extent

that they constitute an "undue hardship" upon the debtor or his dependents. The debtor contends that his financial condition is such that he is incapable of repaying his student loan obligations, which total approximately $73,000.00. He believes that to compel repayment of these debts would in fact constitute an "undue hardship" upon him. The defendants, however, submit that the debtor is well qualified to pursue employment in several different professions and would be able to repay the loans if he tried. They therefore request that this adversary proceeding be dismissed. The debtor is represented by Mark D. Wallace; defendant The Education Resources Institute, Inc., is represented by John D. Eaton; and defendant Educational Credit Management Corporation, as successor in interest to Sallie Mae, is represented by Alejandro F. Hoyos.

The facts are as follows. The debtor is 42 years old. He is single and has no children. He admits that he does not suffer from any current medical condition that would impair his ability to obtain gainful employment. He received an undergraduate degree from the University of Miami. In the early 1990s, he decided to, as he says, "improve [his] education" by enrolling in a graduate program at Barry University. He pursued a degree in mental health counseling. He graduated from Barry in December 1995 and completed an unpaid internship with Catholic Family Services in February 1996. Thereafter, he sought work, be it full or part-time, in the mental health field. He was unable to find a job in his chosen profession for a significant period of time.

To support himself, he worked as a professional tennis instructor and coach. At one point earlier in his life, the debtor played professional tennis and apparently was once ranked in the top 800 players in the world. While not exactly what he intended when he entered Barry University, for a period of time after graduation he was able to support himself (albeit in a rather meager fashion) with the income from tennis instruction. Unfortunately, in September of 1996, he ruptured his Achilles tendon. The injury required surgery, and he was unable to work. After a lengthy rehabilitation process, he resumed his job search. In March of 1997, he began working on a part-time, hourly basis at Horizon Psychological Services, his present employer.

While he has worked for Horizon for approximately four years, the debtor's testimony is that the job is "inconsistent and low paying." For example, according to schedule C of his 1999 federal tax return, his employment with Horizon earned him a profit of $6,040.00 on "gross receipts" of $7,035.00.[1] According to the defendants, however, this is not an accurate picture of the debtor's overall financial situation. In addition to his skill as a tennis instructor, the debtor is also a licensed real estate broker. The defendants contend that if he truly wished, the debtor could make considerably more than his present income simply by pursuing these other options more seriously.

---

1. The debtor supplied the Court with his federal tax returns for the years 1992–1999. In none of those years did he generate sufficient income to rise above the poverty level. For example, in 1998 he reported total income of $3,470.00. This included $237.00 in net earnings from tennis instruction ($1,040.00 in gross receipts, offset by $803.00 in expenses), $1,183.00 from Horizon ($2,289.00 in gross receipts, offset by $1,106.00 in expenses), and $2,050.00 from his employment as a real estate broker ($3,780.00 in total receipts, offset by $1,730.00 in expenses). Earlier years reflect similar earnings: for example, $3,833.00 in total income for 1997; $1,921.00 in total income for 1996; and $2,215.00 in total income for 1995.

The defendants also suggest that the debtor has "admittedly limited" his employment options by routinely restricting his employment searches to the fields of mental health and tennis instruction. The debtor's testimony, however, is that his lack of success in the real estate business, together with the fact that his counseling responsibilities prevent him from being available to show properties, are the reasons that he has not pursued that career option. Another complaint raised by the defendants is that the debtor has "limited" himself by focusing on employment within the confines of Miami Beach, Florida. According to the debtor, he has made contact with psychologists, psychiatrists, social workers, mental health counselors, school counselors, and marriage and family therapists in an effort to "develop referral sources and work sites."[2] However, it is true that the majority of his efforts have been focused in Miami Beach, and that he has done little to seek employment even in the greater Miami area.

For example, they point to the fact that while he has visited various employment web sites, the debtor did not consult a professional service for career advice. His flyers for tennis instruction were only sent to private homes. He didn't contact many hospitals to look for work. His real estate license has only netted him one or two transactions, and he doesn't have consistent employment with a broker or agency. And they also note that he is apparently able to repay loans from his mother but cannot make payments on his student loans. The defendants suggest that all of

this points to the debtor's potential for a far greater income than he has manifested in the past. And which brings the Court to the ultimate inquiry: while the debtor has historically made very little by way of income, is this debt dischargeable under 11 U.S.C. § 523(a)(8)?

11 U.S.C. § 523(a)(8) has a long and tortured history, and the dischargeability of student loans was a source of political and judicial tension even before the enactment of the bankruptcy code in 1978. *See generally,* Jeffrey L. Zackerman, *Discharging Student Loans in Bankruptcy: The Need for a Uniform "Undue Hardship" Test,* 65 Univ. Cinn. L.Rev. 691 (Winter 1997); Robert F. Salvin, *Student Loans, Bankruptcy, and the Fresh Start Policy: Must Debtors Be Impoverished to Discharge Educational Loans?,* 71 Tul. L.Rev. 139 (Nov.1996). In the 1960s and early 1970s, students frequently sought to discharge their student loans as general unsecured claims in bankruptcy.[3] Anecdotal evidence suggested that in certain instances students were filing bankruptcy shortly before graduation, without even attempting to make repayment. Other stories indicated that so-called "professionals," such as doctors and lawyers, were seeking to discharge the very loans that made it possible for them to pursue potentially lucrative careers. Ultimately, as one court noted,

> A few serious abuses of the bankruptcy laws by debtors with large amounts of educational loans, few other debts, and well-paying jobs, who have filed bankruptcy shortly after leaving school and

**2.** He also continues to pursue his career as a tennis instructor. According to his responses to the interrogatories served on him by defendant The Education Resources Institute, Inc. ("TERI"), he has sent flyers to private homes (again in the Miami Beach area) in hopes of developing more tennis-related income. He has also contacted several career-related web

sites and posted his resume. And he also advertised his counseling services in the local paper, the *New Times.*

**3.** The bankruptcy act of 1898 in operation at the time did not contain an exception to discharge for student loans.

before any loans became due, have generated the movement for an exception to discharge.

*Matter of Rappaport,* 16 B.R. 615, 616 (Bankr.D.N.J.1981).

The 1970s saw the formation of a Commission on the Bankruptcy Laws of the United States, whose purpose was to review the 1898 Act and suggest modifications to the law based upon modern commercial and consumer practices. Those recommendations culminated in a report submitted to Congress in 1973. The Commission recommended that student loans should be presumptively nondischargeable unless the debtor could show that he or she was unable to earn sufficient income to fund repayment attempts. The Commission's "model statute" submitted with the report would have prohibited discharge of student loans which came due within five years of the bankruptcy filing, absent a showing of "undue hardship." The Commission did not define "undue hardship," but stated:

> In order to determine whether nondischargeability of the debt will impose an "undue hardship" on the debtor, the rate and amount of his future resources should be estimated reasonably in terms of ability to obtain, retain, and continue employment and the rate of pay that can be expected. Any unearned income or other wealth which the debtor can be expected to receive should also be taken into account. The total amount of income, its reliability, and the periodicity of its receipt should be adequate to maintain the debtor and his dependents, at a minimal standard of living within

their management capability, as well as to pay the educational debt.

*See* Executive Director, Commission on the Bankruptcy Laws of the United States, Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 137, pt. II (1973), reprinted in *Collier on Bankruptcy* app.2 (Lawrence P. King ed., 15th ed.1996), at 140–41.

▮ Three years after the Commission submitted its report, Congress enacted a substantively similar statute as part of the Education Amendments of 1976. *See* Pub.L. No. 94–482, § 439A, 90 Stat. 2081, 2141. When Congress enacted the present bankruptcy code into law in 1978, this exception to discharge was retained. The legislative history thus reflects a continuing congressional policy that it should be more difficult to obtain a discharge of educational obligations than is the case for typical unsecured debts.[4] This Court recognizes that fact. Yet it seems that the judicial interpretation of the section has often failed to address the point of the statute, which is to prevent "debtors with large amounts of educational loans, few other debts, and well-paying jobs" from obtaining a discharge. See *Rappaport,* 16 B.R. at 616. The section is not designed to force impoverished debtors into repayment plans they have no hope of actually honoring. In this Court's opinion, the undue hardship examination should have as its essential starting point one simple question: Is there a reasonable prospect that the debtor will ever be able to repay these loans? This is an examination best left to the sound discretion of the trier of fact, as it is the trial court that is in the best position to judge the debtor's veracity and

---

4. For example, the restrictions on discharge of student loans originally applied only in chapter 7 liquidation cases, but in 1990 Congress amended the code to make § 523(a)(8) applicable to chapter 13 cases as well. At the same time, Congress extended the nondis-chargeability period from five years to seven. In 1998, Congress removed the time limit, and at the present time the only way a student loan can be discharged is if the debtor makes a sufficient showing that repayment would constitute an "undue hardship."

prospects. And it is one that should take into consideration all of the available evidence without being limited to mechanical tests or the presence of physical or mental disabilities.[5]

■ In recent years, there has been considerable debate about how a court should decide what constitutes an "undue hardship." A variety of tests have evolved to address the issue—with such short-hand references as "the *Johnson* mechanical test" or the "totality of the circumstances" test or the "ability to pay" test or the "additional circumstances" test. *See* Thad Collins, Note, *Forging Middle Ground: Revision of Student Loan Debts in Bankruptcy as an Impetus to Amend 11 U.S.C. § 523(a)(8)*, 75 Iowa L.Rev. 733, 744–45 (1990). It appears that the Eleventh Circuit has not yet addressed the issue. It does appear that a majority of the circuits have adopted the "additional circumstances" test first promulgated by the Second Circuit in the case of *Brunner v. New York State Higher Educ. Services Corp.*, 831 F.2d 395 (2d Cir.1987). *See also Pennsylvania Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298 (3d Cir.1995); *Matter of Roberson*, 999 F.2d 1132 (7th Cir.1993). This test provides that a student loan may not be discharged unless the debtor demonstrates:

1. That the debtor cannot maintain, based on current income and expenses, a "minimal standard of living for [himself] and [his] dependents if forced to repay the loans."

2. That additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans.

3. That the debtor has made good faith efforts to repay the loans. *Brunner*, 831 F.2d at 396; *Roberson*, 999 F.2d at 1135; *see also Faish*, 72 F.3d at 305–06 (adopting the *Brunner* test as being most reflective of congressional intent).

■ However, this Court agrees far more with the Sixth Circuit's decision in *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433 (6th Cir.1998). In that case, the court specifically declined to adopt any one particular test. Instead, the court looked to "many factors," including the amount of debt, the debtor's claimed expenses and current standard of living, and any evidence regarding the debtor's efforts to minimize those expenses. *Id.* at 437. There is little reason to attempt to shoehorn debtors into the rigid framework of a "test" when the focus of the code is to provide the "honest but unfortunate" debtor with a fresh start. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 657, 112 L.Ed.2d 755, 764–65 (1991). The presumption inherent in § 523(a)(8) is not that all student loans are nondischargeable, but that those debtors with sufficient income to fund repayment should not be allowed to eliminate the very debts that provided them with a pleasant standard of living. *See Barrows v. Illinois Student Assistance Comm'n (In re Barrows)*, 182 B.R. 640, 649 (Bankr.D.N.H.1994) (court is most concerned with debtor's future employability).

■ In truth, this Court questions not so much the articulated aspects of the

---

5. A number of courts focus on such mechanical criteria as whether the debtor's income falls below the government's poverty guidelines, or whether the debtor is disabled in some fashion. *See, e.g., Holmes v. Sallie Mae Loan Servicing Ctr. (In re Holmes)*, 205 B.R. 336 (Bankr.M.D.Fla.1997); *Griffin v. Eduserv (In re Griffin)*, 197 B.R. 144 (Bankr.E.D.Okla. 1996). Undoubtedly, these are valid points in determining what constitutes an undue hardship. However, they should not be the exclusive criteria for determining dischargeability.

*Brunner* analysis but rather many of the student loan decisions which litter the judicial landscape, especially when those decisions are examined with proper deference to the history of § 523(a)(8). Many decisions discuss "undue hardship" in the most stringent of terms. They do not concern themselves with the "adequacy" of the debtor's income, but focus solely upon whether the debtor is scraping by on a "minimal" standard of living. Such decisions ignore the fact that the adequacy of the debtor's income must receive equal attention in the analysis. *See In re Correll,* 105 B.R. 302, 306 (Bankr.W.D.Pa. 1989) (where a family earns a modest income and the family budget reflects no frivolous expenditures but is still "unbalanced," an undue hardship exists).

A debtor who lives in a cardboard box because of mental illness and unemployment may well be entitled to a discharge under § 523(a)(8) (whether such a debtor cares about the discharge is another matter entirely). A debtor who lives in a stately suburban home and finds enough surplus income to fund mutual funds and other retirement vehicles is clearly not as likely to receive a discharge. Between the two extremes are many debtors who struggle to make ends meet, who live paycheck to paycheck, who use credit cards to augment their income, and who are incapable of making a meaningful repayment on their student loans. As the court stated in *Faish,* the bankruptcy code does not require that the debtor "live in abject poverty ... before a student loan may be discharged." 72 F.3d at 305. The court's obligation is to determine the amount "minimally necessary" to ensure that the debtor's needs for care, including food, shelter, clothing, and medical treatment are met. *Rice v. United States (In re Rice),* 78 F.3d 1144, 1149 (6th Cir.1996).

Despite this Court's many misgivings about the *Brunner* analysis, even under that approach the debtor in this case has demonstrated that repayment of his student loans would constitute an "undue hardship." The first prong of the *Brunner* test "requires an examination of the debtor's current financial condition to see if payment of the loans would cause his standard of living to fall below that minimally necessary." *See Roberson,* 999 F.2d at 1135. The second prong "recognizes the potential continuing benefit of an education" and requires that the debtor "show his dire financial condition is likely to exist for a significant portion of the repayment period." *Id.* The final prong requires the debtor to demonstrate that he or she has made a good faith effort to repay the loans, as measured by "his or her efforts to obtain employment, maximize income, and minimize expenses." *Id.* at 1136.

As the *Faish* court recognized, the *Brunner* test does not require showing of economic futility by the debtor. Rather, it too focuses on the debtor's ability to pay the debts. This is reflected in the fact that a minimal standard of living requires "more than a showing of tight finances." *Stein v. Bank of New England, N.A. (In re Stein),* 218 B.R. 281, 287 (Bankr. D.Conn.1998). If the debtor has done everything he can to minimize expenses and maximize income, there is no basis for refusing to discharge the student loans. *Ammirati v. Nellie Mae, Inc. (In re Ammirati),* 187 B.R. 902, 907 (D.S.C.1995). In the end, what the court must do is examine the debtor's current income and expenses and determine a "flexible minimal standard of living" which is sensitive to the particular circumstances of each case through the application of common sense. *Stein,* 218 B.R. at 287.

The defendants in this case basically charge that the debtor could do more to

generate income but has not. While they have not specifically charged that he is lazy, or that he has intentionally created a situation where his income is artificially lower than it should be, such perceptions of the debtor are the logical conclusion of their argument. After hearing the debtor's testimony, however, the Court is convinced that his various career tracks are not the lucrative opportunities the defendants suggest. For example, his tennis instruction has never garnered a considerable income. While it is true that he has not sought employment as a tennis pro, he testified that such positions are difficult to obtain. He sent flyers to private homes in the Miami Beach area believing that such was the best avenue for him to explore. Tennis instruction has not historically generated much in the way of income, and there is nothing in the record to suggest that this will change in the future.

Further, while the defendants want this Court to consider the fact that the debtor supposedly has many options available to him, they fail to consider the fact that these careers are to a large extent mutually exclusive. For the debtor to accept a position as a tennis pro, or to pursue more clients for individual tennis instruction outside of the Miami Beach area, will result in less time available for other endeavors, such as his mental health career. He testified that he had not pursued employment in the real estate business because he would have to pay certain dues simply to maintain his license (which, given his present income level, results in a serious barrier to his reentry into that field). Further, he had never been particularly successful at this line of work. Whether there are successful real estate brokers in the world is beside the point; the debtor has not

realized such success. And finally, for him to be available to show homes and obtain listings would also mean that he would be unable to devote consistent hours to his counseling practice.[6]

Each change in the debtor's situation results in certain consequences. The defendants point to the fact that the debtor has not sought employment outside the Miami Beach area. The debtor does not have a car, although he apparently borrows his mother's car from time to time. For him to pursue any form of employment outside the area which is accessible by public transportation would again limit the time he could devote to other employment "options," or would necessitate the purchase of a vehicle. His primary occupation is that of mental health counselor. To the extent that the debtor sought to conduct either tennis instruction or real estate sales outside the Miami Beach area, it is difficult to envision how public transportation would allow him to travel to and from his appointments without adding considerable time and expense to the process. The purchase of a vehicle would of course add to his expenses, and further limit the amount available for payment of student loan debt. In any event, increased transportation costs might adversely affect his pursuit of his desired occupation.

The debtor obviously wants to pursue his career in mental health counseling. He has tried to obtain his license but has been prevented by the cost of the licensing process. Apparently, he must have a certain number of sessions in which he is supervised by another counselor. The supervision fees charged for such sessions are more than he earns from the session itself, and he has had a difficult time finding the money to cover the difference.

---

6. After all, real estate brokers are required to work odd hours, often showing homes at their customers' convenience. The debtor testified that this would interfere with his ability to be available for his patients on a consistent basis.

Nonetheless, he hopes to have his license in December of this year. While it is an important step forward in his career, it seems unlikely to make a significant impact on his income. His testimony was that many of his licensed colleagues at Horizon are also working part-time. For most practitioners, the mental health field is simply not very lucrative. As the court stated in *Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356, 360 (6th Cir.1994):

> [T]he [debtors] chose to work in worthwhile, albeit low-paying, professions. There is no indication that they were attempting to abuse the student loan system by having their loans forgiven before embarking on lucrative careers in the private sector.

The debtor in this case has likewise pursued a worthwhile career in the mental health field. It is not particularly lucrative. But there is no evidence whatsoever that would suggest he is likely to make significantly more money in the future, or that he is "attempting to abuse the student loan system" by discharging these debts before embarking upon a profitable career in *any* field, let alone mental health.[7]

Reviewing the debtor's income and expenses, it is clear he limits his expenses. He makes approximately $549.00 per month after taxes. His expenses are only $544.00 per month. This includes a condominium maintenance fee of $92.00 per month. The debtor testified that as a result of an inheritance, he was able to obtain clear, unmortgaged title to his condominium. The defendants suggest that his ownership of this condominium—which the debtor valued at between $50,000.00 to $75,000.00—should be taken as evidence that he has the ability to repay his student loans. However, it is unclear to the Court how this could be true. For the debtor to somehow "liquidate" this asset would require the replacement of it, at a cost he clearly cannot afford.[8]

This Court recognizes that the notion of "undue hardship" means that student loans are not discharged simply because repayment may cause some "major personal and financial sacrifices." *Faish*, 72 F.3d at 306. Current financial adversity, characteristic of all debtors in bankruptcy, is not determinative. *Wardlow v. Great Lakes Higher Educ. Corp. (In re Wardlow)*, 167 B.R. 148, 151–52 (Bankr. W.D.Mo.1993). As *Brunner* directs, there must be some "additional circumstances" that indicate the inability to pay will persist for the foreseeable future. Some courts would suggest that the code requires the debtor to demonstrate a "certainty of hopelessness." *See Barrows*, 182

---

**7.** There are many forms of "profitability," of course. The monetary return from one's employment is only one measure of the job's overall worth, be it to the individual or society as a whole. As the *Cheesman* court recognized, it is not appropriate to penalize debtors simply because the line of work they chose won't earn enough money to cover their student loans. Unless there is something to suggest that they will turn around and pursue a "lucrative career in the private sector," they should be given the benefit of the doubt. *See* 25 F.3d at 360. The student loan system has also come under fire for guaranteeing loans and extending credit in situations which do not offer much hope of repayment (student loans for truck driving schools or beauty programs, to name only two).

**8.** If he sells the condo, he would either have to purchase another unit or find an apartment. It would be impossible for him to find a place to live on the $92.00 available in his budget for "rent or home mortgage." Likewise, if he mortgaged the unit, he has no income with which to fund the repayment of *that* loan. Clearly, his payment of $92.00 per month for his condo maintenance fees constitutes the amount "minimally necessary" for him to obtain shelter. *See Rice*, 78 F.3d at 1149.

B.R. at 648. However, this Court is not among them. It is the feasibility of repayment, not the absolute certainty of financial destitution, that is the key determination. *Roberson*, 999 F.2d at 1135 (court must focus on whether lack of financial ability is "likely" to continue into the foreseeable future).

The debtor has documented his efforts to find employment. There are logical reasons for limiting his search to the Miami Beach area. For him to pursue employment significantly outside that area would require additional expenses, which might offset many of the possible gains in income. The debtor does not live lavishly. Instead, he survives from paycheck to paycheck. This is the type of debtor § 523(a)(8) was designed to benefit. *See Windland v. United States Dep't of Educ. (In re Windland)*, 201 B.R. 178, 182 (Bankr.N.D.Ohio 1996). Based on a review of his income and expenses, the Court has no other choice but to conclude that he has made every effort to "minimize expenses and maximize income." *Ammirati*, 187 B.R. at 907. Repayment of the student loans would mean that the debtor would be unable to maintain a minimal standard of living. *Roberson*, 999 F.2d at 1135. There is nothing left once the debtor allocates funds for food, shelter, clothing, and medical treatment. *Rice*, 78 F.3d at 1149. Therefore, he has satisfied the first prong of the *Brunner* test.

The debtor has also demonstrated the existence of "additional circumstances" within the meaning of *Brunner*. Even if the debtor could squeeze enough from his living expenses to pay a few dollars on the loans at issue in this case, "committing him to that enterprise over the next 20 years would amount to an insupportable sentence of impoverishment and hopelessness unless, of course, his circumstances improve substantially and unforeseeably."

*Elebrashy v. Student Loan Corp. (In re Elebrashy)*, 189 B.R. 922, 927 (Bankr. N.D.Ohio 1995). The Court foresees no such improvement.

The final aspect of the *Brunner* test is that of "good faith." Quite simply, the debtor must have made a good faith effort to repay his loans. This portion of the test reflects the fact that "[w]ith the receipt of a government-guaranteed education, the student assumes an obligation to make a good faith effort to repay those loans, as measured by his or her efforts to obtain employment, maximize income, and minimize expenses." *Roberson*, 999 F.2d at 1136. This does not mean that the debtor must have made payments to the creditor. Rather, "a failure to pay will not result in a finding of lack of good faith where the debtor has no funds to make any repayment." *Elebrashy*, 189 B.R. at 928; *see also Coats v. New Jersey Higher Educ. Assistance Auth. (In re Coats)*, 214 B.R. 397 (Bankr.N.D.Okla.1997); *Sands v. United Student Aid Funds (In re Sands)*, 166 B.R. 299 (Bankr.W.D.Mich.1994).

In this case, the debtor has tried to generate income without significant success. The Court will not penalize him when his failure to make payments results from circumstances beyond his control. *See Roberson*, 999 F.2d at 1136 (the debtor's condition must arise from factors beyond his "reasonable control"). The debtor's financial condition is not the result of some willful or negligent activity on his part. His ruptured Achilles tendon interfered with his tennis instruction. He was not successful as a real estate broker. He has pursued a career in mental health but that has not been particularly financially lucrative. He attempted to find employment and took the jobs which were available to him. He has acted in good faith in striving to provide a sufficient livelihood for himself. He simply cannot repay the

loans. He has demonstrated that repayment would cause an "undue hardship" upon him within the meaning of 11 U.S.C. § 523(a)(8).

■■■■ One issue that often arises in these cases is whether the court can "defer" repayment on student loans to some date in the future, at which time the debtor's financial circumstances could be reconsidered. *See Roberson*, 999 F.2d at 1138. A number of courts have also held that the code permits judicial modification or restructuring of the underlying debt. *See Cheesman*, 25 F.3d at 360. This Court does not believe such a dramatic reworking of the bankruptcy code is appropriate. There is nothing in § 523(a)(8) which would justify such a remedy. In fact, the sole basis for either deferments or partial discharges is found not in § 523(a)(8), but rather in 11 U.S.C. § 105(a), which provides that the court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *See Cheesman*, 25 F.3d at 360.

However, as the Supreme Court stated in *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391, 397–98 (1992):

> [C]anons of construction are no more than rules of thumb that help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. [citation omitted]. When the words of a statute are unambiguous, then, this first canon is also the last: "judicial inquiry is complete." [citation omitted].

The language of § 523(a)(8) is simple and unambiguous. The debtor is entitled to a discharge of his student loan debt only if he demonstrates that repayment would constitute an "undue hardship." Nothing in the statutory language even remotely suggests that Congress wanted the bankruptcy courts to delay making this determination, or serve as loan workout specialists by restructuring the debt. If such had been Congress' intent, certainly some suggestion of this authority would be found in the code. For example, other sections of § 523(a) provide exceptions to discharge "to the extent" that debts meet certain criteria. Had Congress included that phrase in § 523(a)(8), partial discharges and deferments would at least have some statutory justification. To authorize partial discharges is tantamount to judicial legislation and is something that should be left to Congress, not the courts. *See United Student Aid Funds v. Taylor (In re Taylor)*, 223 B.R. 747, 753 (9th Cir. BAP 1998); *Skaggs v. Great Lakes Higher Educ. Corp. (In re Skaggs)*, 196 B.R. 865 (Bankr.W.D.Okla.1996).

■■■■ While § 105(a) provides the bankruptcy courts with broad, equitable powers, they are not without limitations. The section does not authorize relief which is "inconsistent" with more specific laws. *In re Rohnert Park Auto Parts, Inc.*, 113 B.R. 610 (9th Cir. BAP 1990). More importantly, the bankruptcy courts should not exercise these equitable powers to create additional property rights or remedies in favor of a debtor or other party in interest *unless those rights or remedies are statutorily authorized under the bankruptcy code. In re Vota*, 165 B.R. 92 (Bankr.D.R.I.1994); *Matter of Schewe*, 94 B.R. 938 (Bankr.W.D.Mich.1989). Any grant of authority given to the bankruptcy courts under § 105(a) "must be exercised within the confines of the bankruptcy code." *Gouveia v. Tazbir*, 37 F.3d 295, 300 (7th Cir.1994). And ultimately, this section is not a "roving commission [for

the court] to do equity." *In re WAPI, Inc.*, 171 B.R. 130, 133 (Bankr.N.D.Ala. 1994).

To interpret § 523(a)(8) as requiring the bankruptcy court to consider deferrals or debt restructuring is to expand the rights and remedies available under the bankruptcy code. It is, in truth, a judicial effort to rewrite the statute Congress authored. This Court will not pursue such a course of action.

Accordingly, upon studying the evidence and testimony presented in this case, the Court concludes that the debtor has satisfied his burden under 11 U.S.C. § 523(a)(8). He has demonstrated that repayment would constitute "undue hardship." It is not appropriate for the Court to consider deferrals or court-ordered repayment plans. This case is not a case of a debtor with a large amount of educational loans, few other debts, and a well-paying job. *See Rappaport*, 16 B.R. at 616. It is the feasibility of repayment that is the key determination, and the record reflects that there is no reasonable prospect that the debtor will ever be able to repay these loans. As such, this is an "honest but unfortunate" debtor entitled to a discharge of his student loans.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.